T. M. Sinclair & Co., Lt'd, Appellee, v. The National Surety Co., Appellant.

**Fidelity insurance:**   FALSE REPRESENTATIONS.   Where the contract between the plaintiff and its agents described the latter as brokers or commission merchants, a representation to a company insuring the fidelity of such agents that they were brokers, is not a fraud vitiating the bond.

**Brokers:** COMMISSION MERCHANTS. Ordinarily one having possession and control of merchandise sent him to sell and collect the price is a commission merchant and not a broker, but this technical distinction is not always recognized and a broker is often entrusted with the duties of a commissionman.

**Same:** KNOWLEDGE OF INSURER: ESTOPPEL. Where a surety company has full knowledge that the parties whose fidelity it insures are acting as commissionmen, but describes them in its bond as brokers, it cannot thereafter be heard to say that it did not insure them as commission merchants.

**Contracts:** RULES OF CONSTRUCTION. Courts are slow to declare the contract of parties void for indefiniteness and uncertainty, but will look to the surrounding circumstances, subject matter, relation of the parties and the ends to be accomplished, and, if possible, give it effect. As between two constructions, each reasonable, the one giving it effect will be adopted; and where there is ambiguity it will be interpreted most strongly against the interest of the party who chose the language.

**Same:** FIDELITY INSURANCE: INSTRUCTIONS. The contract to make frequent inspection and audit of the accounts of commissionmen is not void for uncertainty; and the error of the trial court in so holding was not cured by an instruction that it was the duty of plaintiffs, in an action on a surety bond, to use reasonable care and precaution in detecting any act of the employé tending to render defendant liable on the bond.

**Proofs of loss:** WAIVER. Absolute denial of liability on a fidelity bond is a waiver of the requirement to furnish proofs of loss; and the acceptance and retention of proofs, without objection, until the time for making the same has expired is a waiver of the right to question their sufficiency.

**Burden of proof.** In a suit upon a fidelity bond the burden is not upon the plaintiff to prove compliance but upon the defendant to prove a breach of the conditions.

**Fidelity bonds:** LIABILITY. Under a fidelity bond securing against personal dishonesty, the obligor is not liable for funds collected by the factors before the bond went into effect, although afterwards dishonestly converted by them.

**Same:** BREACH: CONVERSION. The merely technical conversion of property is not a breach of a fidelity bond indemnifying against personal dishonesty.

*Appeal from Linn District Court.*— HON. WILLIAM G. THOMPSON, Judge.

Wednesday, May 9, 1906.

Rehearing Denied, Saturday, December 15, 1906.

Action at law upon surety bonds guarantying the fidelity of a firm of brokers, who were doing business for plaintiff in Alaska. Trial to a jury, verdict and judgment for plaintiff, and defendant appeals.— *Reversed.*

*Charles D. Harrison,* for appellant.

*Charles A. Clarke & Son* and *William G. Clarke,* for appellee.

Deemer, J.— Prior to August 30, 1901, the firm of Higgins & Ogilvie was appointed by plaintiff as its broker or commission merchant for Dawson, in the Yukon district of Alaska, to handle its meat products in that district. The firm was to receive the goods, pay freight thereon when not prepaid, care for and dispose of the product for cash or gold dust, and deposit from day to day the proceeds from sales in a named bank at Dawson for and on account of plaintiff, and to make at least weekly remittances to plaintiff's representative at Portland, Ore. Plaintiff was to pay freight, duty, and insurance on the goods, drayage, rent of warehouse, furnish watchman for the goods, and to bill them to the firm f. o. b. Portland, at its jobbing prices, freight and other charges added. The firm of Higgins & Ogilvie was to sell the goods at a named price and to guaranty payment of all goods sold. When goods were sold, they were to be billed to the purchaser in triplicate, one of which was to be mailed to plaintiff at Portland, Ore., on the day of sale or delivery of the goods, and when the whole of any shipment should be sold the brokers were required to render plaintiff an " account sales," showing gross amount realized, deducting commissions, expenses, etc., addressed to plaintiff

at Portland, Ore.; and no claims were to be allowed for damaged goods, short weights, or otherwise, without a statement of the facts, and allowances made therefor either by plaintiff or the bank at Dawson.    At the end of each month the broker was to send to plaintiff at Portland an account current, showing transactions for the month, and a weekly statement was also required from the broker, showing the amount of unsold goods and of cash on hand.    It was also required to furnish monthly statements of commissions earned or claimed by it.    As compensation, the broker was to receive one-half the net profits on the goods.    The first shipment under this contract was made by plaintiff on May 28, 1901.    For an agreed premium, defendant, a surety company, on August 31, 1901, undertook to make good any losses which plaintiff might sustain on account of the personal dishonesty of Higgins & Ogilvie in the conduct of plaintiff's business from July 14, 1901, to July 15, 1902; liability being limited to the sum of $2,000.    On the 16th day of November, 1901, defendant, in consideration of an increased premium, credit being given for the unearned premium on the original bond, increased the liability on the bond to the sum of $10,000.    It is claimed that plaintiff suffered loss on account of the personal dishonesty of the firm or of its members, and it asked judgment on each bond — on the first to the full amount thereof, and on the second to the amount of nearly $8,500.    The case went to trial upon issue joined, resulting in a verdict for plaintiff in sum of $6,656.20.

Defendant admitted the execution of the bonds, but pleaded fraud in the procurement thereof.    It also pleaded immunity from liability growing out of a breach of the brokerage contract by plaintiff.    It further pleaded plaintiff's failure to make frequent audits and examinations of its brokers' accounts, and neglect to use reasonable steps and precautions to prevent any act on the part of its brokers which would render defendant liable, as it promised it would

do by the terms of its engagement with the defendant. It also averred that whatever losses plaintiff suffered were due to its own fault, and not to the personal dishonesty of its brokers. Failure to furnish proper and timely proofs of loss as provided by the terms of the bonds was also relied upon as a defense. A reply was filed, pleading an estoppel upon defendant to deny its liability on the second bond, and averring that plaintiff had fully complied with all the conditions of the bonds in suit. After the case had been partially tried defendant filed an amendment to its answer, setting up some other defenses; but on plaintiff's motion this was stricken, and the case was finally tried upon the issues heretofore stated.

It appears that plaintiff made five shipments of meats to its Dawson broker. The first left Seattle June 6, 1901, and amounted, with freight added, to $7,926.26; the second was made August 5, 1901, and amounted to $468.80; the third, August 27, 1901, amounting to $1,456.51; the fourth in September, 1901, amounting to $4,293.02, and the fifth September 26, 1901, amounting to $2,916.13. Higgins & Ogilvie made no acknowledgment of the receipt of any of the shipments after the first, and it seems that plaintiff never made any inquiries with reference thereto at any time. The brokers did not comply with the terms of their contract with plaintiff requiring them to make daily deposits and weekly remittances; nor did they make the required triplicate invoices, or account sales, nor weekly or monthly reports. Plaintiff did not make any audit or examination of Higgins & Ogilvie's accounts, statements, or books, and no settlement has ever been made between them. It is claimed, however, that plaintiff suffered on account of their personal dishonesty to an amount exceeding the verdict returned by the jury. The last reported sale by Higgins & Ogilvie was under date of September, 1901; and the last deposit made by them in the Canadian Bank, save one for a gross sale, was of date September 10, 1901. The accounts of sales did not

correspond with the deposit slips down to the time the bond
was increased; there being a shortage of about $200. The
first bond covered defalcations between July 14, 1901, and
July 15, 1902, and the second was an increase of the first,
and by its terms covered the same period. This new bond
or increase was made on November 16, 1901, although the
premium was not paid until January 8, 1902, some twenty-
three days after it was due. Higgins & Ogilvie abandoned
the business at Dawson on December 4, 1901, and turned
the property then in their possession over to one Driscoll,
and he, in turn, on or about March 1st of the next year,
surrendered the same to the Canadian Bank, in which the
brokers were to make deposits, so that Higgins & Ogilvie
were not in possession of any of the goods after December
4, 1901, and, of course, defendant is not responsible for
the goods or their proceeds after that date. 'Nor is it
liable for any defalcations occurring before the time cov-
ered by the first bond.

, · The alleged errors chiefly relied upon relate to the
ruling of the court denying to defendant the right to amend
its answer during the trial, to the instructions given and
refused, and to the insufficiency of the evidence to support
the verdict. In view of the disposition made of the case,
it is unimportant that we consider the ruling on the amend-
ment to the answer.

The first point to which we shall refer has relation
to the capacity in which Higgins & Ogilvie were acting
when the claimed defalcations occurred. The bond insures
1. FIDELITY IN-    plaintiff against the personal dishonesty of
SURANCE: false
representations. Higgins & Ogilvie in the performance of their
duties as plaintiff's brokers at Dawson, Y. T.; and the
petition alleges that the firm of Higgins & Ogilvie, as such
brokers, obtained the money for which this action is brought
through personal dishonesty. This is denied by defendant
in its answer; and it is further alleged that plaintiff mis-
represented the capacity in which Higgins & Ogilvie were

acting, well knowing that they were not acting as brokers, but that in truth they were commission merchants, and not brokers. There is no testimony to support the plea of fraud, save that the original contract of employment and the bonds are in evidence; and these show that the conduct of Higgins & Ogilvie as brokers is guaranteed, and that they were, in fact, entitled to and had possession of the goods under their contract with plaintiff appointing them as its " brokers or commission merchants." This is not enough to establish the allegation of fraud.

But it is said that only while acting as brokers was their conduct guarantied, and that the testimony shows they were not so acting when the defalcations occurred. It is doubt-

**2. BROKERS:**
**commission**
**merchants.**

less true that Higgins & Ogilvie were, strictly speaking, commission merchants, and not brokers, for they had possession of and absolute control of the merchandise shipped them, and had power to collect the purchase price of goods sold. *Edwards v. Hoeffinghoff* (C. C.) 38 Fed. 641; *Slack v. Tucker,* 23 Wall. (U. S.) 330 (23 L. Ed. 143); *Braun v. City,* 110 Ill. 194. A broker has as a general rule neither the possession of the goods nor authority to collect the purchase price of those which he sells. But, aside from this technical distinction arising from the use of names without more, a broker is in practice often intrusted with possession of the property and given authority to collect; thus combining his character as broker with that of a factor or commission man. Mechem on Agency, section 980; citing *Barry v. Boninger,* 46 Md. 59.

Moreover, it appears in this case, that defendant knew how Higgins & Ogilvie were acting, and with this knowledge it described them as brokers in the bond which it wrote

**3. SAME:**
**knowledge of**
**insurer;**
**estoppel.**

for itself. This being true, it is in no position to say that they were not acting as brokers when the default occurred. There was no change in their duties and responsibilities at any time, and, as defendant chose its own language in which to describe

them, it cannot be heard to say that it did not insure them in the position in which they were acting.

II. The seventeenth provision of the bond contained this stipulation: " The receipt and retention hereof . . . shall be taken and held as a covenant . . . that the employer will make frequent audits and examinations, and at all times during the term hereof take and use all reasonable steps and precautions, to detect and prevent any act upon the part of any employé, which would tend to render the company liable for any loss." We have seen that at no time did plaintiff make any audit or examination of the books, business, accounts, or statements of Higgins & Ogilvie until after they had abandoned its employment. The trial court instructed the jury in its seventh instruction that the provision of the bond requiring plaintiff to make frequent audits and examinations was so vague and indefinite that it could not be determined what was intended thereby; and that the jury should entirely disregard defendant's claim that it had not been complied with. The other requirement that plaintiff should use all reasonable steps and precautions to prevent any act of the brokers which would render defendant liable was submitted to the jury under an instruction which is not very seriously complained of. Error is predicated upon instruction 7, and upon the court's failure to give defendant's tenth request, to the effect that, if plaintiff did not make frequent audits and examinations of Higgins & Ogilvie's accounts, then it could not recover.

It is true, of course, that a contract may be so vague and indefinite as that it is impossible to collect from it the intent of the parties thereto; and in such cases the instrument is void, and no recovery may be had thereon, either at law or in equity. *Rue v. Rue,* 21 N. J. Law, 377; *Thomson v. Gortner,* 73 Md. 474 (21 Atl. 371); *Reed v. Lowe,* 8 Utah, 39 (29 Pac. 740). But it is with great reluctance that courts reject any agreement as insensible or unintelligible.

4. Contracts: rules of construction.

One of the canons of construction is to give effect to every provision of a contract, if possible and practicable; for the reason that the parties themselves evidently intended something thereby, and it is not for courts to reject the same unless it be so vague and uncertain that neither a general nor a particular intent can be gathered therefrom. In other words, a contract should be so construed, if possible, as to give effect to each and every provision thereof. *German Ins. Co. v. Roost,* 55 Ohio, 581 (45 N. E. 1097, 36 L. R. A. 236, 60 Am. St. Rep. 711); *McKay v. Barnett,* 21 Utah, 239 (60 Pac. 1100, 50 L. R. A. 371). As between two constructions, each reasonable, one of which will accomplish the intention of the parties and make the contract an enforceable one, and the other which will make it unenforceable and meaningless, the former is to be preferred. *Shreffler v. Nadelhoffer,* 133 Ill. 536 (25 N. E. 630, 23 Am. St. Rep. 626); *Alfree v. Gates,* 82 Iowa, 19; *Powers v. Clark,* 127 N. Y. 417 (28 N. E. 402). As the provision in this contract was inserted by defendant and for its benefit, any ambiguity therein is to be taken most strongly against the party who chose the language. *Gillet v. Bank,* 160 N. Y. 549 (55 N. E. 292); *Paul v. Ins. Co.,* 112 N. Y. 472 (20 N. E. 347, 3 L. R. A. 443, 8 Am. St. Rep. 758); *Mueller v. University,* 195 Ill. 236 (63 N. E. 110, 88 Am. St. Rep. 194). But it is said that this rule is resorted to only when all other tenets of construction fail. *Patterson v. Gage,* 11 Colo. 50 (16 Pac. 560). And manifestly this must be so; for it presupposes a binding contract of some kind, and is primarily a rule of construction, and not of destruction. To arrive at the intent of the parties, the surrounding circumstances should be taken into account, and the court should place itself as nearly as may be in the position of the parties who made the contract. It should look to the subject-matter of the contract, the relation of the parties thereto, and the objects and ends intended to be accomplished thereby. In so doing, it should take into

consideration other contracts having reference to or bearing upon the one before it, especially where the latter has reference to the same subject-matter as the former, and is the means whereby the former is carried out. *Drennen v. Satterfield,* 119 Ala. 84 (24 So. 723); *Melone v. Ruffino,* 129 Cal. 514 (62 Pac. 93, 79 Am. St. Rep. 127).

With these rules in mind, we now go to the provision in question, and find that it obligates plaintiff to make frequent audits and examinations to detect and prevent any act of its employé which would tend to render defendant liable.

Putting ourselves as nearly as we may in the position of the parties when this bond was given, we find that plaintiff had a contract with Higgins & Ogilvie which obligated the latter to make various reports, statements, deposits, etc., which, if properly checked up and examined, would show any default or mismanagement on their part. Of this defendant is presumed to have had notice, and it undertook to become responsible for the conduct of the firm under its contract with plaintiff, provided plaintiff would make frequent audits and examinations to detect and prevent, etc. Are these words " frequent audits and examinations " so indefinite and insensible in view of the situation thus described as to be unintelligible, and therefore void? We think not. " To audit " is to examine and adjust, as to audit and adjust accounts. Primarily it means a hearing; but not necessarily so. What was it which was to be audited and examined? Manifestly the accounts and statements which Higgins & Ogilvie were required by the terms of their contract with plaintiff from time to time to make. No hearing was contemplated for the brokers were in Alaska, and plaintiff's branch house in Portland, Ore. So that a personal hearing was not contemplated. The reports and statements were to take the place of personal supervision, and the audit and examination was manifestly to be of these.

<div style="margin-left:2em; font-size:smaller;">5. SAME: fidelity insurance: instructions.</div>

There was evidence to show that plaintiff made no such audits or examinations as it promised; and this issue should have been submitted to the jury under proper instructions. The term "frequent" should be construed with reference to the situation of the parties, and means no more than with reasonable frequency, depending upon the situation of the parties, and the existing obligations of the contract with reference to accounts, etc.

We are constrained to hold that the trial court was in error in declaring the provision of the bond now under consideration invalid. The error was not cured by the subsequent instruction requiring plaintiff to take and use reasonable steps and precautions to detect and prevent any act on the part of the employé tending to render defendant liable; for the jury may well have said, taking the instructions together, that this did not include the auditing or examination of the brokers' accounts, statements, etc. Our conclusion on this branch of the case finds support in the following: *Board v. Citizens' Co.*, 30 U. C. P. 132; *Harbour Com. v. Guaranty Co.*, 22 Can. Sup. Ct. 542; *Rice v. Fidelity Co.*, 103 Fed. 429 (43 C. C. A. 270); *Hunt v. Fidelity Co.*, 99 Fed. 243 (39 C. C. A. 496). Appellee seems to rely principally upon the rule of construction already alluded to, to the effect that the language should be construed most strongly against the defendant. This we concede to be the rule, but it does not meet the proposition announced by the trial court that the provision is void for uncertainty. The rule cannot be used to refine away the terms of a contract or to destroy its validity as an enforceable obligation. *Guaranty Co. v. Bank*, 183 U. S. 419 (22 Sup. Ct. 124, 46 L. Ed. 253).

III. Failure on plaintiff's part to furnish proofs of loss is relied upon as a defense. It seems that plaintiff attempted to make two separate proofs of loss; one under the $2,000 bond, and the other under the increased one. As to the second, defendant de-

6. PROOFS OF LOSS: waiver.

nied all liability under the increased bond, because of want of authority on the part of its agent who granted the increase and received the premium. This was a clear waiver of any proofs of loss, and of defects, if any, in those furnished; for an attempt to make or correct them would have been an idle ceremony. *Stephenson v. Bankers' Ass'n,* 108 Iowa, 646, and cases cited.

As to proof of loss under the first bond, this was furnished or attempted to be furnished May 15, 1902. It was retained by defendant without objection, suggestion, or complaint until June 27th, when it returned the same to plaintiff with a demand for new proof. The bond provided that proofs should be made within six months from the time liability thereunder terminated. The time for making proofs under the first bond expired May 16, 1902; and defendant, although receiving the original proofs in time, made no objection thereto until June 27th, and then demanded new proofs, which, if furnished, must have been after the time therefor had expired. In these circumstances defendant was bound to make its objections to the proofs within a reasonable time, to the end that they might be met, if possible. As it failed to to do so, it waived any further proofs. *Young v. Ins. Co.,* 45 Iowa, 383; *Dyer v. Ins. Co.,* 103 Iowa, 531; *Green v. Ins. Co.,* 84 Iowa, 137. This matter of waiver of proofs was properly submitted to the jury.

IV. Defendant insists that it was for plaintiff to show full compliance with each and all of the conditions of the bond, and that the jury should have been so instructed. But that is not the rule of this court. It was for defendant to plead and prove breach of these conditions. *Jones v. Accident Ass'n,* 92 Iowa, 658.

7. BURDEN OF PROOF.

V. The bond provided that defendant should not be liable for any sum whatever which the employé at the commencement of the bond term owed his employer. As it was given to cover the personal dishonesty of the employé,

and not to guaranty payment of his debt, it is manifest, we

**8. FIDELITY BONDS: liability.** think, that defendant is not liable for any money collected by Higgins & Ogilvie before the bond went into effect, and which was afterwards dishonestly converted by them. This thought was not presented to the jury by the trial court, although request was made of it to do so in proper instructions. Indeed, the contrary proposition was announced by the court. In this there was error prejudicial to appellant. At the time of the execution of the first bond Higgins & Ogilvie had been plaintiff's brokers, handling goods for some time, and under the evidence was indebted to plaintiff for goods sold. As to this amount, defendant was not responsible, no matter if the money thus received was thereafter dishonestly converted.

VI. The first bond went into effect July 14, 1901, and the increased bond was given November 16, 1901. In this connection defendant asked an instruction as follows: " If you find from all the evidence that any of the meats, produce, or merchandise, or the proceeds thereof were wrongfully converted to the use of the firm of Higgins & Ogilvie, or either of them, between July 13, 1901, and March 3, 1902, and if you further find from the evidence that said wrongful conversion of said meats and products, or the proceeds thereof, if you find there was any, was wrongfully converted to the use of said Higgins & Ogilvie, or either of them, by said firm, or either member thereof, was all done by them prior to November 16, 1901, then you are instructed that the defendant is not liable to plaintiff under the contract sued on in an amount greater than $2,000 which is the amount of the original bond, and your verdict should not exceed that sum." This instruction announced the law, and should have been given. It was not covered by any of those read to the jury.

VII. In the twelfth instruction the court said that if Higgins & Ogilvie, or either of them, knowingly failed and refused to account for and turn over plaintiff's property

when demanded by plaintiff or the proceeds of the sales thereof then in their possession, as required by their contract, this would be such personal dishonesty as would render defendant liable on its bond. In other words, a technical conversion was treated by the trial court as a dishonest act on the part of the employé. Manifestly this cannot be the law. That the instruction was prejudicial is clear. Higgins & Ogilvie abandoned the business in December of the year 1901. Thereafter they had no personal charge of the goods, and could not have been guilty of any personal dishonesty in connection therewith. In this action defendant is sought to be held for the value of all the goods shipped Higgins & Ogilvie, less proper and legitimate credits. If the jury followed the instruction just referred. to, it was justified in charging defendant with the goods or the proceeds thereof while in the hands of Driscoll or the Canadian Bank. This, of course, cannot be the measure of defendant's liability.

9. SAME: breach: conversion.

VIII. If it be true, as plaintiff seems to contend, that liability on the increased bond did not begin until the increase was made, then the trial court was in error in its fourteenth instruction, regarding the extent of defendant's liability under this increased bond. We shall not set out the instruction in full. Suffice it to say that it made defendant liable for all moneys in the hands of Higgins & Ogilvie at the time the increase of bond was granted, although such moneys were not dishonestly appropriated until after the bond was increased. We are not to be understood as saying that the rule announced is incorrect. Our position here is based upon what we understand to be plaintiff's view of defendant's liability under the original and the increased bond. It is contended for appellant, as we understand it, that defendant's liability is no different than it would have been had there been two separate and independent bonds. If that be true, then it is difficult to see how defendant can be made liable for money owing plaintiff at the

time the increased bond was given. We are in so much doubt on this proposition that we make no definite pronouncement thereon. It may be that the instruction viewed in the light of the expressed terms of the bond as increased is correct. Indeed, as an abstract proposition, we are inclined to think it is correct. What we have said is bottomed upon what we understand to be counsel's contention as to defendant's liability under the original and the increased bond. If wrong in this, then we are not prepared to say there was error in the instruction as given.

Other matters argued need not be considered, for they are either without merit or are not likely to arise upon a retrial. But for the errors pointed out the judgment must be reversed and the cause remanded for a retrial.

Appellant's motion to strike appellee's amended abstract, which was submitted with the case, is overruled.— *Reversed* and *remanded.*