## 11918

### SALLEY, RECEIVER v. GLOBE INDEMNITY CO. *ET AL.*

#### (131 S. E., 616)

1. EVIDENCE—PLAINTIFF, IN COURT OF COMMON PLEAS, IS ONLY REQUIRED TO PROVE HIS CASE BY GREATER WEIGHT OF EVIDENCE.—A plaintiff, in Court of Common Pleas, suing on employee's fidelity bond, is only required to prove his case by greater weight of evidence, and not beyond reasonable doubt.

2. INSURANCE—SURETY ON A BOND PROVIDING FOR REIMBURSEMENT FOR LOSS DUE TO FRAUD OF EMPLOYEE NOT LIABLE FOR NEGLIGENCE OR CARELESSNESS.—Surety on a bond providing for reimbursement to employer for loss due to fraud and dishonesty of employee will not be liable for loss due to mere negligence or carelessness.

3. INSURANCE—EVIDENCE HELD INSUFFICIENT TO SUSTAIN CHARGE OF LOSS BECAUSE OF FRAUD OR DISHONESTY OF EMPLOYEE.—In action against surety on bond for reimbursement to employer for loss due to fraud and dishonesty of employee, evidence *held* insufficient to sustain charge of loss by reason of fraud or dishonesty of employee in the loss of fifty bales of cotton from warehouse.

4. INSURANCE—MERE FACT OF DISAPPEARANCE OF COTTON FROM WAREHOUSE WAS NOT ENOUGH IN ITSELF TO SUPPORT CHARGE OF FRAUD AND DISHONESTY OF EMPLOYEE.—Fact that fifty bales of cotton had disappeared from warehouse is insufficient in itself to support charge of fraud and dishonesty of employee, such as to create liability of surety on employee's bond.

Before SEASE, J., Orangeburg, October, 1923. Reversed and remanded with directions.

Action by J. Stokes Salley, as Receiver, against the Globe Indemnity Co. and another. From a judgment for plaintiff, defendants appeal.

*Messrs. W. C. Wolfe* and *J. L. Dukes,* for appellants, cite: *Warehouse bond:* Civ. Code 1922, Sec. 3899. *Degree of proof required for criminal charge in civil action:* . 37 S. C., 468; 16 S. C., 440.

*Messrs. A. H. Moss* and *M. E. Zeigler,* for respondents, cite: *Case distinguished:* 37 S. C., 468. *Degree of proof required for criminal charge in civil action:* 124 S. E., 7; 105 S. E., 686; 37 S. C., 468; 229 F., 326; Ann. Cas., 1917-C, 416; 148 F., 353. *Condition shown presumed to continue in absence of evidence of change:* 107 S. E., 479; 35 L. R. A. (N. S.), 1174; 87 S. C., 174.

February 5, 1926.

The opinion of the Court was delivered by MR. ACTING ASSOCIATE JUSTICE C. J. RAMAGE.

This action was brought to enforce an alleged liability upon a bond written by the Globe Indemnity Company. It appears that the Orangeburg Bonded Warehouse Company was engaged in the business of storing cotton for hire in the city of Orangeburg, S. C. By an order of the Court, this company was put into the hands of a receiver in October, 1920, and J. Stokes Salley was appointed receiver to take charge of this warehouse, and he still holds this position. A fire occurred in December, 1920, which burned a portion of the cotton stored there. For some time previous to October 26, 1920, defendant George L. Blackmon was the manager of this warehouse and, upon the appointment of J. Stokes Salley as receiver, he continued the said Blackmon in the position as manager. He was required by Salley to furnish bond. The following is a copy of such portions as are material to the inquiry here:

The bond was dated 18th of February, 1921, and was to be effective from March 18, 1921, to March 18, 1922; was in the sum of $10,000; "the surety * * * shall * * *reimburse the employer * * * for such pecuniary loss as the employer shall have sustained of money, securities or other personal property belonging to the employer or in the employer's possession and for which the employer may be legally liable, by any act of fraud, dishonesty, forgery, theft, embezzlement, unlawful abstraction, or willful misapplication upon the part of the employee in the performance of the duties of the office or position in the above service of the employer hereinbefore referred to, as such duties have been or may hereafter be stated in writing by the employer to the surety, and occurring during the continuance of this bond and discovered at any time within 6 months after the expiration or cancellation of this bond. * * *"

At the time of the fire in December, 1920, when a portion of the cotton was destroyed, the insurance company settled for the burned cotton and there was a record left as to how much cotton still remained in the warehouse. In December, 1921, the warehouse was checked up and a shortage of 50 bales of cotton was discovered. This action is brought against the defendants for this shortage, on the above-mentioned bond.

As it will be necessary to go into the testimony fully in this case in order to determine the issues, further statement of same need not be made here.

This case was tried on circuit, before Judge Sease and a jury at the October, 1923, term of the Court for Orangeburg County. A verdict was returned for the plaintiff for the amount sued for, and defendants appealed from the action of the Circuit Court.

Under our view of the case only two questions will be considered: (1) What is the rule as to the weight of testimony to be applied in this case? (2) Was it error to refuse to direct a verdict for the defendants?

1. Judge Sease held that the plaintiff only had to prove his case by the greater weight of the evidence and not beyond a reasonable doubt. We think Judge Sease was right in this holding. The rule is so well established that a plaintiff in the Court of Common Pleas is only required to prove his case by the greater weight of the evidence as not to require even citation of authority. Any other rule would only produce confusion worse confounded." If there be any statements in any of the cases to the effect that the "preponderance of evidence" rule is not universal in the Common Pleas Court, such statement and such case is so glaringly and utterly in opposition to the law and practice of the Courts as to be entirely disregarded. Judge Sease was decidedly right, and is supported by the following authorities in his position: 25 Corpus Juris, p. 1114, and cases cited in L. R. A., 1916-F, at bottom of page 435 (second column) and at the top of page 436, in the argument of counsel. The main case is referred to further on in this opinion.

2. The next question that arises is as follows: Was it error to refuse to direct a verdict for the defendants? As a preliminary, certain questions of law and fact will have to be examined.

The words in the bond are "fraud, dishonesty, forgery, theft, embezzlement, wrongful abstraction, or willful misapplication." It is plain that mere negligence or carelessness will not be sufficient to hold the surety under this bond.. This is apparent from even a casual reading of the words. The language used implies positive acts of wrongdoing. The authorities are equally as positive and to the point. "Thus a loss resulting from the employee's carelessness or inattention to business, or other acts or omissions, not fraudulent or dishonest, imposes no liability on the insurer." 25 Corpus Juris, pp. 1093, 1094; *Monongahela Coal Co. v. Fidelity, etc., Co.,* 94 F., 732; 36 C. C. A., 444; *State Bank v. Hartford Acc., etc., Co.,* 28

Pa. Dist. R., 847; *Sinclair v. National Surety Co.,* 107 N. W., 184; 132 Iowa, 549; *Kansas Flour Mills Co. v. American Surety Co.,* 158 P., 1118; 98 Kan., 618. "Surety bond, indemnifying principal against loss sustained by fraud or misapplication of agent, does not extend to loss by simple mistake of agent without fraud in paying for merchandise." *Kansas Flour Mills Co. v. American Surety Co.,* 158 P., 1118; 98 Kan., 618. "Where a fidelity bond insured the obligee as principal against loss through the personal dishonesty of its factor, the mere failure of the factors to turn over to the principal on demand property belonging to him, or the proceeds thereof, is not a breach of the bond rendering the surety company liable." *Sinclair v. National Surety Co.,* 107 N. W., 184; 132 Iowa, 540. There are more cases to the same effect cited on pages 1094 and 1095 of volume 25 of Corpus Juris.

Now let us see if there was any testimony to go to the jury on this allegation of the complaint, which condenses the contention of the plaintiff:

"That, while the said bond was in force and operative, plaintiff lost 50 bales of cotton, of the value of $5,615.24 from its possession, and for which it was legally liable, and said loss was occasioned by the acts of fraud and dishonesty of the defendant George E. Blackmon, its said manager, and by other acts of the said (George E.) Blackmon against which the plaintiff was protected in and by the aforesaid bond, and the said defendants are justly and truly indebted to plaintiff in the said sum of $5,615.24 for the said cotton, etc."

We have seen the charge; now we shall investigate whether or not it is sustained by the evidence, as to *fraud* and *dishonesty.*

J. S. Salley, plaintiff, sworn, says:

"Warehouse was burned on December 25, 1920, audit was made, insurance company paid for 700 bales of burned cotton, audit showed 905 bales of cotton left in the portion

of the warehouse not burned, continued Blackmon as man-
ger, required him to furnish bond. I discovered a shortage
of 50 bales of cotton in warehouse in December, 1921.
Blackmon had been manager continuously from the fire in
December, 1920, to discovery of the shortage—shortage
was discovered by an audit, a report made by accountants
H. S. Blanton and R. M. Wilson. The duties of Blackmon
as manager were to go to warehouse every day except Sun-
day and to follow my instructions. He had the keys to
warehouse; I had none. I did not carry or keep any of the
keys. I instructed him to keep close watch on the warehouse
all of the time. I did not require him to be there every min-
ute, but he was presumed to be there all day, and to deliver
cotton when called for by the patrons of the warehouse and
to bring me the canceled receipts and the storage money;
he did that, generally. Blackmon was responsible to me for
that cotton. I required Blackmon to report to me practically
every day, and he made such reports. I cautioned him to
keep the gates and the doors properly locked and to watch
the premises and see that nothing was tampered with, and
he told me everything was all right; never told me anything
was wrong. The auditors, not Blackmon, discovered the
shortage—warehouse is two stories, 38 bales short in the
upper story and 12 in the lower. Blackmon delivered cotton
along during the year 1921, when called for, some from the
upper and some from the lower story. I think 13 deliveries
were made when shortage was discovered, asked Blackmon
to explain, but didn't do so to my satisfaction, being very
vague—he told me that he did not have any watchman at
the warehouse at night, which is true. I talked to him from
time to time about the shortage, and instructed Auditor
Wilson to make a thorough audit, rolling out cotton and
counting it bale by bale. Blackmon told me before the sec-
ond count that he had discovered a door on the eastern side
of the warehouse opening in the top story loose. I examined
this door with him. He suggested cotton might have gotten

out that way. I looked at the door, and that is all I could do, was just to take his explanation. I asked him when the shortage occurred, and he stated he could not say positively, but was satisfied it had occurred in the last 30 days, for he knew the cotton was there within 60 days before. He showed me the door which he claimed had been tampered with, and said he had just found that out. I discharged Blackmon and took up the keys. When I took up the keys, he gave me only one key to door next to Santee Cotton Mills. This door had two keys, and he said that he had never had but one key, and that Harold Scott, the Negro laborer who assisted him, might have the other; he did not know. This was a surprise to me. Scott was a little Negro about 18 or 19 years old, who helped him about the warehouse. Blackmon explained that Scott had helped the Seignious boys to run the warehouse before I became receiver— had Scott around helping them, but they were careless with keys, and he thought that Scott might have gotten it. In that way Mr. Blackmon employed Scott to assist while he was manager, and I think Scott was usually around to help deliver cotton as the head man around the warehouse. Scott was exclusively in Blackmon's employment, but he was paid by me when Blackmon brought in the pay roll. When cotton was put in the warehouse, a receipt was given for it, and when taken out, the receipt was returned and canceled. The cotton lost belonged to 8 or 9 different parties. We figured the cotton on the date the loss was discovered by market price."

Cross-examination: "Warehouse was an old building renovated. I think it had been burned four times and rebuilt. It had cement floors and wooden walls. The doors were heavy wood and 6 or 8 feet wide and about the same height. Seignious boys were large cotton dealers—failed and left large liabilities—no audit when I took charge in 1920. Warehouse operated by Seignious boys before I became receiver. I was president and then receiver. Only

a part of the cotton was burned. Four doors on the east
side of the warehouse and 6 on the other side, making 10
doors in all. Blackmon gave me two keys to all doors ex-
cept one, which he explained Negro Scott might have. The
locks were of the hasp variety, but locks were fairly good
Yale padlocks. Mr. Blackmon said that the Seignious boys
left the keys lying around, and he thought the Negro Scott
had one of the keys, as he had never had but one to one of
the doors. Blackmon was not prosecuted criminally. He
was born and raised in Orangeburg and lived here all his
life. I do not know how the cotton was lost nor when. The
warehouse did not have a warehouse bond, just railroad
bond, so far as I know. I had the surety bond on Mr.
Blackmon as manager. When the doors were shut, it was
dark in the warehouse. There were no sky lights in the
warehouse."

Redirect: "There are street lights around the building—
kept no watchman, but the Santee mills and the Bamberg
Lumber Company keep watchmen. Blackmon assisted in
the count which showed the 50 bales short, and said that it
was correct. He stated that he knew the cotton had been
there and that it was now gone. I drove down to the ware-
house sometimes and looked around it; did this right often
and looked at the doors, but found nothing wrong. I in-
structed Mr. Blackmon to keep a close watch on everything,
and he said that he did. I tried to find out all I could in
reference to the loss and did the best I could to protect the
interests of the company, but I have never been able to as-
certain how the cotton came short. I have no intention or
desire, either as receiver or individually, to prosecute Mr.
Blackmon individually. Just want the cotton or the value."

The rest of the testimony is about the details of the audit
of the cotton and throws no light on how the cotton got out.
It was stated by Mr. Blanton, who made the audit in De-
cember, 1920, at the time of the fire—he stated that the
cotton was counted bale by bale, except Mr. Cart's and Mr.

Crum's, whose cotton was counted by taking the number of bales, height, and the number in a row, and estimating the number of bales in that way. It was shown that there were 50 bales lost out of the warehouse between the two audits. But how? No one in the testimony has even attempted to answer this and there are no circumstances going to show that it got out through the instrumentality of Blackmon, who merely denied knowing anything about how the shortage occurred. He stated that the door that was in bad order was on the back of the warehouse; that when he left for dinner he left the warehouse open; that Scott helped in the warehouse; that none of the doors faced the street; that there were doors both down and up stairs; that he got off for a day for several occasions, but not for long—was sick during that year—cotton was in back of warehouse and office in front, could not see all of the cotton, did not notice any vacant spaces in the cotton, would look around the premises and stay home for dinner about an hour, leaving the warehouse in charge of the Negro and open.

Mr. Moss, attorney for respondent, made this statement in the cross-examination of Blackmon:

"I never heard anything against you myself, son; nothing wrong with you; I will be frank and tell you that."

Blackmon stated that the warehouse was not large and that he could look over it often and see if anything was missing. He reiterated that he did the best he could—performed his duty and knew of nothing wrong till Wilson found the shortage.

We have thus gone over the printed testimony carefully and have given the gist of it, giving the plaintiff's in detail. We find nothing to bear out the charges set out in the complaint, except, perhaps, at most negligence on the part of Blackmon and the loss of 50 bales of cotton. We have already seen that simply negligence will not fasten liability on the defendants.

The only question that remains is: Will the fact that

Blackmon had the control and management of the cotton, and the fact that 50 bales disappeared for which Blackmon can give no account, make the defendants liable as set out in the complaint? "That the evidence of theft is wholly circumstantial does not defeat recovery on a policy of insurance against loss by theft, although it provides that assured shall produce direct and affirmative evidence that the loss was due to theft; disappearance of the articles not to be deemed such evidence." *Miller v. M. Bonding and Ins. Co.,* 93 A., 320; 247 Pa., 182; L. R. A., 1915-D, 615. Something more than the mere fact of loss is required to be established before the assured can recover under the policy. Id.

On November 30, 1912, National Surety Company delivered to American Savings Bank Company a bond to cover any loss which the said American Savings Bank Company, employer, might sustain by reason of any act of personal dishonesty, forgery, theft, larceny, embezzlement, wrongful conversion, or abstraction, on the part of any employee named in the schedule, which contained the names of 18 of the employees, showing the amount of liability for each employee. The employer alleged in the complaint that, while the bond was in force, there was unlawfully converted and abstracted from its funds the sum of $8,500 and that, at the time this sum was so abstracted, three certain employees, whose names appear in the said schedule and no others, had access to the funds from which the $8,500 was abstracted. It was not alleged which one of the said employees took the money. The Court said that, while the evidence tended to narrow the question down to one of the two employees as being the one who took the money, and that while both of these were covered by the bond, yet that this was not sufficient; that it was necessary to show that a certain person, whose name appeared in the schedule, took the money, and that narrowing the inquiry down to two or three would not suffice. *American Savings Bank & Trust Co. v. National*

*Surety Co.,* 157 P., 877; 91 Wash., 307; L. R. A., 1916-F, 435.

In a note in 46 L. R. A. (N. S.), p. 567, the learned annotator, by the citation of a number of cases, says:

"As a rule, no recovery can be had upon policies indemnifying against loss by burglary, theft, or larceny, where the evidence merely shows that property covered by the policy is missing."

A careful study of the cases cited in 25 Corpus Juris, pp. 1114, 1115, and also the cases cited in note to *Citizens' Trust Co. v. Globe & Rutgers Fire Insurance Co.,* 229 F., 326; 143 C. C. A., 446, found in Ann. Cas., 1917-C, p. 416 *et seq.,* all go to show that the conclusions set forth in the above quotations are correct; that is to say, that the simple fact that goods or personal property disappear under circumstances such as are detailed in the testimony in this case will not be sufficient to support the charge of "fraud and dishonesty" made in the complaint. We hold that the plaintiff has failed to produce testimony tending to prove his case; therefore the motion for a directed verdict ought to have been granted by the Court below, and it was error to have refused the motion.

The judgment of this Court is that the judgment of the Circuit Court be reversed; that the complaint be dismissed as to the defendant Blackmon without prejudice to the right of the receiver to proceed against him as he may be advised; and that the case be remanded to the Circuit Court, with instructions to enter up judgment in favor of the defendant the Globe Indemnity Company under rule 27.

MESSRS. JUSTICES WATTS, COTHRAN and MARION, and MR. ACTING ASSOCIATE JUSTICE PURDY concur.

MR. CHIEF JUSTICE GARY did not participate.