**R. Emmett KERR, as Trustee in Bankruptcy for National Discount Corporation, Appellant,**

v.

**The AETNA CASUALTY AND SURETY COMPANY, Appellee.**

**Charles W. GAMBRELL, Receiver for National Fidelity Insurance Company, Intervenor, Appellant,**

v.

**The AETNA CASUALTY AND SURETY COMPANY, Appellee.**

**Charles W. GAMBRELL, Receiver for Cudd and Coan, Underwriters, Inc., Intervenor,**
Appellee in No. 9973,
Appellant in No. 9974,

v.

**The AETNA CASUALTY AND SURETY COMPANY,**
Appellant in No. 9973,
Appellee in No. 9974.

**Charles W. GAMBRELL, Receiver for Title Insurance and Guaranty Company, Intervenor, Appellant,**

v.

**The AETNA CASUALTY AND SURETY COMPANY, Appellee.**
Nos. 9942, 9972–9975.

United States Court of Appeals
Fourth Circuit.

Argued July 1, 1965.

Decided Aug. 5, 1965.

Neville Holcombe, Spartanburg, S. C. (T. Sam Means, Jr., and Robert F. Chapman, Spartanburg, S. C., on brief), for R. Emmett Kerr in No. 9942.

Elmer W. Beasley, Hartford, Conn. (W. H. Arnold and Thomas A. Wofford, Greenville, S. C., on brief), for Aetna Casualty & Surety Co. in Nos. 9942, 9973 and 9974.

T. E. Walsh, Spartanburg, S. C. (Glen E. Craig, Columbia, S. C., on brief), for Charles W. Gambrell in No. 9972.

Frank A. Lyles, Spartanburg, S. C. (Glen E. Craig, Columbia, S. C., on brief), for Charles W. Gambrell in Nos. 9973 and 9974.

Robert L. Stoddard, Spartanburg, S. C. (Charles C. Moore, Spartanburg, S. C., and Glen E. Craig, Columbia, S. C., on brief), for Charles W. Gambrell in No. 9975.

Elmer W. Beasley, Hartford, Conn., and W. H. Arnold, Greenville, S. C. (Thomas A. Wofford, Greenville, S. C., on brief), for Aetna Casualty & Surety Co. in Nos. 9972 and 9975.

Before SOBELOFF and BOREMAN, Circuit Judges, and THOMSEN, District Judge.

THOMSEN, District Judge.

These appeals arise out of an action begun by the Trustee in Bankruptcy of National Discount Corporation (National Discount) against Aetna Casualty and Surety Company (Aetna) to recover under a fidelity bond issued by Aetna to National Discount and seven other corporations as the named Insured. The Insurance Commissioner, as receiver for three other corporations also named as Insured in the bond—National Fidelity Insurance Company (National Fidelity), Title Insurance and Guaranty Company (Title), and Cudd & Coan Underwriters, Inc. (Underwriters)—was allowed to file separate intervening complaints asserting his claims as receiver for the respective companies. The cases were heard by Judge Martin, without a jury. Testimony was taken in each case and much documentary evidence stipulated or admitted. The Judge filed a separate opinion in each of the four cases; in three of them he rejected all of the claims; in one, the Underwriters case, he allowed some claims and disallowed others.

No attempt will be made in this opinion to set out in detail the facts found with such meticulous care by the District Judge. No question has been raised with respect to his findings of historical facts. Although some of the inferences which he drew and conclusions which he reached are challenged in each case, we cannot say that any of his findings were clearly erroneous or that any of his conclusions were incorrect, except in the Underwriters case discussed in VI below.

██ Since jurisdiction is based on diversity of citizenship, 28 U.S.C.A. § 1332, the cases are controlled by South Carolina law.

I

For ten years or so before July, 1961, A. D. Cudd, Jr. and William D. Coan controlled a small financial empire, centered in Spartanburg, S. C., consisting of a number of insurance, finance, and related corporations in which, with one exception,[1] Cudd and Coan or companies controlled by them owned all or most of the stock. Among those corporations were: National Discount, which was engaged in the business of financing the purchase of automobiles and the purchase or improvement of other property; Title, a wholly owned subsidiary of National Discount, which insured the automobiles financed by National Discount; Whole-

---

1. The one exception was National Discount Corporation, of which Cudd and Coan owned or controlled substantially all of the voting stock but considerably less than half of the non-voting stock.

sale Motors, Inc., which sold the automobiles repossessed by National Discount; National Fidelity, another insurance company; and Underwriters, which operated a general insurance agency, acted as an insurance company to the extent of reinsuring part of the business written by the other insurance companies controlled by Cudd and Coan, and supplied to those companies on a commission basis all services usually rendered by the home office employees of an insurance company.

Cudd and Coan served as officers and directors of all of the companies. They were the only directors of Underwriters and Title, but National Discount and National Fidelity had other directors, as well, and all of the companies had other officers.

For several years Cudd and Coan had procured for the four companies above named and a number of other controlled corporations a blanket fidelity bond covering their respective employees, which was written from time to time by different insurance companies. Effective January 1, 1960, Aetna issued such a bond naming as the Insured eight corporations, including the five described above.

The losses covered by the bond include "Fidelity—(A) Any loss through any dishonest or fraudulent act of any of the Employees, committed anywhere and whether committed alone or in collusion with others, including loss of Property through any such act of any of the Employees".

"Employee" and "Employees" were defined "to mean, respectively, one or more of the officers, clerks and other natural persons in the service of the Insured * * * during the currency of this bond and who are compensated by salary, wages or commissions, and whom the Insured has the right to govern and direct at all times in the performance of such service * * *."

Section 1(d) of the "Conditions and Limitations" eliminated coverage for acts by a director as such; [2] section 1(e) eliminated losses from loans unless the loan was fraudulently made.[3]

Section 4 of the Conditions required prompt notice after discovery of a loss.[4]

Section 12 provided for termination of the bond as a whole in certain events, and for termination as to individual employees upon discovery of any dishonest or fraudulent act on the part of such employee.[5]

The bond further provided: "Knowledge possessed or discovery made by any Insured * * * or officer thereof shall for the purposes of Section 4 and of subsection (a) of the second paragraph of Section 12 of this bond constitute knowledge or discovery by all the insured and termination of this bond as to any Employee as provided in Section 12 shall apply to all the Insured * * *."

---

**2.** "(d) Any loss resulting from any act or acts of any director or trustee of the Insured other than an Employee of the Insured, except when performing acts coming within the scope of the usual duties of an Employee, or while acting as a member of any committee duly elected or appointed by resolution of the board of directors or trustees of the Insured to perform specific, as distinguished from general, directorial acts on behalf of the Insured."

**3.** "(e) Any loss the result of the complete or partial non-payment of or default upon any loan made by or obtained from the Insured, whether procured in good faith or through trick, artifice, fraud or false pretenses, except when covered by Insuring Clause (A) * * *."

**4.** "At the earliest practicable moment after discovery of any loss hereunder the Insured shall give the Underwriter written notice thereof and shall also within six months after such discovery furnish to the Underwriter affirmative proof of loss with full particulars."

**5.** "This bond shall terminate in its entirety * * * (c) immediately upon the taking over of the Insured by a receiver or other liquidator or by State or Federal officials * * *.

"This bond shall terminate as to any Employee—(a) immediately upon discovery by the Insured of any dishonest or fraudulent act on the part of such Employee * * *."

The Aetna bond picked up any liability covered by the previous bonds, subject to customary provisions with respect to discovery, notice and the like. Some of the claims made by plaintiffs in these four cases arise out of alleged losses which occurred before the Aetna bond was issued.

## II

The largest claims consist of transactions between several Insured named in the bond, including loans, contributions to capital, advances and commissions. Smaller claims involve payments to Cudd or Coan individually or credits to the account of one or the other of them on the books of one of the corporations. One claim involves a loan to a corporation which was not an Insured.

Some of the transactions were wash transactions intended to make a financial statement of one of the insured corporations look better and so mislead or deceive the Insurance Commissioner or a bank which was considering a loan, but did not deceive or despoil the insured corporations. Judge Martin correctly held that there was no loss with respect to any of those items.

In connection with all of the claims, it is important to note that the bond insured only the several corporations. Levey v. Jamison, 4 Cir., 93 F.2d 810 (1938). Losses in connection with fraud perpetrated on the corporations' creditors or on the Insurance Commissioner are not covered by the bond.

Aetna has raised substantially the same defenses in each of the four cases. They are summarized in note 6 below.

## III

### The National Discount Case

The Trustee for National Discount claims $635,230.12, based on transactions between that corporation and Title, directly or through a related corporation, in 1960 and 1961. Shortly before, in 1959, National Discount had suffered heavy losses, only partly covered by insurance, which had reduced its net worth to about $380,000. Its investment in Title was carried at $359,000, and National Discount had some bad accounts; so, if Title failed, National Discount would fail too. Title had reinsured National Fidelity for 75% of its underwritings, including National Fidelity's extremely large exposure on its Florida mobile trailer policies, after a prior reinsurance of $1,000,000 with Lloyds of London. In the early fall of 1960 Hurricane Donna hit Florida, causing heavy loss. The claims against National Fidelity as a result of the hurricane grew to more than $2,000,000, most of which were eventually paid. In an effort to enable Title to make good its obligations to National Fidelity and to save National Fidelity and Title, National Discount advanced additional capital to Title; later, to improve National Discount's borrowing capacity, National Discount sold Title to Home Realty Company, an inactive company controlled by Cudd and Coan, and took a note

6. Aetna's defenses are: Cudd and Coan were not employees of the several corporations (the Insured) within the coverage of the bond (See definition of "Employees" above); Cudd or Coan or both acted as controlling stockholders and directors in the transactions complained of, not as employees of the several corporations, so any loss occasioned thereby was excluded from coverage (See section 1(d) of the Conditions and Limitations of the Bond, note 2); many of the transactions were loans or voluntary debit and credit transactions excluded from coverage (See section 1(e) of the Conditions, note 3); even if Cudd and Coan acted as employees, the several corporations sus-

tained no loss through any "dishonest or fraudulent act" on the part of either of them, covered by the bond; assuming there was such a loss or losses, various notices required by the bond were not given (See section 4 of the Conditions, note 4); the bond had terminated as to each employee immediately upon discovery by any of the named Insured of the first fraudulent or dishonest act of such employee; and the failure of the Insured and particularly of Underwriters, which acted for the others, to disclose to Aetna the acts complained of which occurred before it applied for and obtained Aetna's bond, precludes any recovery thereon.

from Home, secured by all the stock of Title, for the sale price and other items. The other items included a loan for a substantial amount from National Discount to Home, which Home agreed to and did pass on as a contribution to the surplus of Title, and which Title paid over to National Fidelity. Title paid to National Fidelity $300,000 of the money which it received directly or indirectly from National Discount before it was due to National Fidelity under the reinsurance treaty. The $300,000 was paid under an agreement calling for "an adjustment of commissions", but Title eventually owed approximately that amount to National Fidelity under the reinsurance treaty. The Trustee in Bankruptcy of National Discount claims that all $635,000 of the advances and loans made by National Discount constitute losses due to the fraud or dishonesty of Cudd covered by the bond.

The District Judge found that there was no such fraud or dishonesty on the part of Cudd. He found that Cudd directed and participated in the transactions in an unsuccessful attempt to save National Discount and its subsidiaries and affiliates from financial ruin in the aftermath of Hurricane Donna; that Cudd did not act alone, but with and on the advice of officers and directors of the corporations involved, including John Staples, the Vice president-General Manager of National Discount, whose good faith is not questioned; and that, although full disclosure of many facts was not made to the creditors of National Discount, those facts were concealed to enable the corporation to borrow more money, not to defraud it of funds it already had. These findings are supported by the evidence.

The District Judge also found that there was no fraud or dishonesty with respect to the other claims made by the Trustee of National Discount. Those claims comprise $77,822.45 for advances by National Discount to Wholesale Motors, Inc., $47,996.16 for loans by National Discount to Florida State Insurance Agency, Inc., a company owned by Cudd, and $5,109.13 for an allegedly improper refund of traveling and other expenses of Cudd.

National Discount dumped its repossessed cars and trailers on Wholesale Motors, Inc., at book value and charged it with the costs of repairing and selling them. National Discount advanced Wholesale's operating expenses and charged its worthless dealer accounts to Wholesale, taking notes to evidence the accounts receivable thereby created. The evidence supports the District Judge's conclusion that National Discount was not defrauded by the advances made "to operate the graveyard for its business losses", and that the operation of Wholesale "appears to be another of the methods employed to improve the appearance of National Discount's balance sheet".

Nothing in the evidence indicates that there was fraud connected with the loans to Florida State. They were ordinary transactions for National Discount when made and were repaid in the usual course of business until May, 1961.

Although some of the expense items included in the $5,109.13 refund were admittedly questionable, the finding of the District Judge, that National Discount received the benefit of all the items for which it was charged, was not clearly erroneous.

In reaching these conclusions the District Judge applied the proper legal principles, holding that positive acts of wrongdoing against the insured corporation must be shown. Salley v. Globe Indemnity Co., 133 S.C. 342, 131 S.E. 616, 43 A.L.R. 971 (1926).

Judge Martin also found that if Cudd was an employee of National Discount covered by the policy, and if he was guilty of dishonest or fraudulent acts which caused losses to that corporation (which he found not to be the case), such acts and such losses were known to the corporations involved, and specifically that they were known to Staples, the Vice president-General Manager of National Discount who was admittedly honest.

Since we agree with the District Judge that the claimed losses to National Discount were not due to any fraud or dishonesty covered by the bond, it is not necessary for us to decide in this case whether and when any of the insured corporations should be charged with knowledge of the alleged fraudulent and dishonest acts, nor to rule on other points raised by Aetna in defense of the claims made by the Trustee. See note 6.

## IV

### *The Title Case*

The Receiver for Title makes a similar claim to that made by the Trustee for National Discount with respect to part of the $635,000 which passed from National Discount through Title to National Fidelity, as explained in the first paragraph of III above. The claim on behalf of Title is for the $300,000 contributed to the surplus of Title which was paid to National Fidelity under the commission adjustment agreement. The District Judge properly found that Title suffered no loss with respect to those payments and that they were not motivated by dishonesty or fraud. He further found that they were handled openly, and that if the $300,000 payment did constitute a loss covered by the bond, the "loss" was discovered by Title, the details were known by National Fidelity and National Discount, and none of them gave notice to Aetna.

The Receiver for Title also makes claim for an alleged overpayment of $76,266.26 "retrospective commissions" to National Discount by Title, and for an alleged overpayment of $21,933.09 commissions on Title's general agency contract with Underwriters. With respect to both items, the District Judge found that there was nothing in the evidence to show who made the overpayments or credits or who directed that they be made, nothing to show the motives or purposes which prompted them, and no evidence to connect either Cudd or Coan with payments or to show that there was dishonesty or fraud on the part of anyone in connection with the payments. He also held that if dishonesty or fraud could be found, there could still be no recovery, for both Title and National Discount "discovered" these credits and gave Aetna no notice of loss.

Finally, the Receiver for Title claims $62,500 on the theory that Cudd and Coan were paid salaries of $5,000 a year "in violation of" the agency contract between Title and Underwriters. Judge Martin found that plaintiff's evidence failed to show any element of dishonesty or fraud on the part of Cudd or Coan concerning the payments made to them for their services as co-managers of Title. The general agency contract did provide that Underwriters would pay the salaries of all employees of Title, but Judge Martin found that "it is reasonable to consider the salaries of the co-managers of Title" as an item not covered by the terms of the general agency contract. We cannot say that the Judge erred in this conclusion. The management contract contemplated the payment of the wages and salaries of ordinary officers and employees. Cudd and Coan were the sole directors and co-managers of Title. We are not here dealing with the definition of "Employee" in the bond; we are dealing with the management agreement. No contention is made that Cudd and Coan were receiving excessive compensation from the several corporations. They received salaries of $30,000 a year from Underwriters and $5,000 a year from Title, nothing from either National Discount or National Fidelity. Judge Martin found no dishonesty or fraud in the granting or receiving of the salaries from Title. He further found that no notice of the alleged loss was given to Aetna.

Since we agree with the District Court that no loss covered by the bond was proved by the Receiver for Title, it is again unnecessary in this case to decide whether and when any of the insured corporations should be charged with knowledge of the alleged fraudulent or dishonest acts, nor to rule on the other points raised by Aetna in defense of the claims made by the Receiver for Title.

## V

### The National Fidelity Case

██ The Receiver for National Fidelity claims $250,582.51 as an alleged overpayment of management commissions to Underwriters for the years 1957 through 1960. On this point Judge Martin found that "the preponderance of the evidence fails to establish an overpayment of a determinable amount. The fact of the matter is that William A. Reade acted for both companies in making these payments and he determined the amount of the payments by the amount of money Cudd and Coan Underwriters, Inc., needed to operate National Fidelity, rather than by the provisions of the contract. Reade made rough checks to see if the payments that he was making were within the terms of the contract but he treated the accounts as open running accounts and never made a strict accounting of the balances". Judge Martin further found that even if it were possible to determine that there was an overpayment under the contract, the evidence contained nothing from which it could be inferred that either Cudd or Coan had anything to do with the payments or that they personally benefited from them. The Receiver does not claim that anyone other than Cudd and Coan acted from an improper motive with regard to those payments, and the District Judge found no fraud or dishonesty in the making of the commission contract.

Although there were some facts tending to prove that there had been an overpayment or that there had been some concealment in the annual reports to the Insurance Commissioner, we cannot say that the findings of the District Judge were clearly erroneous, or that his denial of this claim was not supported by the evidence.

The Receiver also makes claim for advances of $21,500 by National Fidelity to National Discount. This was the net balance left after some $500,000 worth of such transactions between the two companies. The advances were made in the usual course of business and fully entered on the books and records of both companies, by persons other than Cudd and Coan. There is no evidence concerning the purpose or motive for these transactions and the District Judge found nothing to indicate that Cudd or Coan or anyone else acted fraudulently or dishonestly in connection with them.

Finally, the Receiver claims certain sums which passed from National Fidelity to Wholesale Motors and to Title in the amounts of $7,300 and $26,971.07, respectively. The entire sum which passed to Wholesale and $25,000 of the sum which passed to Title were found by the District Court to be wash transactions intended to improve the financial appearance of National Fidelity in its report to the Insurance Commissioner. Deception practiced on the Insurance Commissioner, while reprehensible, was not covered by the bond, which only protected against loss due to fraud perpetrated on an insured corporation. See Levey v. Jamison, 4 Cir., 93 F.2d 810 (1938).

The District Judge correctly held that there was nothing to show that National Fidelity parted with anything of value, much less that it suffered any loss through the fraud or dishonesty of Cudd or Coan. Once again, it is unnecessary to rule on the other points raised by Aetna in defense of the claims made by the Receiver for National Fidelity.

## VI

### The Underwriters Case

██ With respect to two of the claims made by the Receiver in this case, the District Court held that the plaintiff's proof was insufficient to support a finding of fraudulent motive. The first of those claims concerns $14,279.21 which the Receiver asserts was improperly paid to Cudd during 1958 and 1959. The only proof offered by the plaintiff was that Underwriters gave Cudd two checks totaling $11,750 and that it advanced $2,529.21 to him. The second claim concerns checks for $12,300 given by Underwriters to Coan. Again, the plaintiff proved nothing more than the fact that

checks were given. The District Judge carefully analyzed the complicated series of transactions offered in evidence by defendant. We accept his findings of fact and agree that the evidence was insufficient to allow recovery on those claims. Salley v. Globe Indemnity Co., 133 S.C. 342, 131 S.E. 616, 43 A.L.R. 971 (1926).

The District Judge allowed recovery under the bond for $16,423.23, representing write-offs on the books of Underwriters of balances due by Cudd and Coan for personal insurance premiums advanced for them by that corporation.[7] Judge Martin held that the accounts in question were personal debts of Cudd and Coan and that the removal of those debits from the books of the corporation without proper credits by payment or otherwise was a loss to Underwriters resulting from the dishonest and fraudulent acts of Cudd and Coan.

In defense of these claims Aetna has raised all of the points set out in note 6 above. It disputes the finding that the write-offs resulted in a loss to Underwriters. That corporation acted, inter alia, as a general insurance agent or broker and there was nothing improper in its advancing the premiums for any of its customers, including its officers, and charging the premiums to their account. Aetna argues that there was no loss to Underwriters as a result of the charge-off of those premiums on Underwriters' books, since the bookkeeping entries, if improper, can be revised or ignored, so that the Receiver may collect any proper balance due from Cudd and Coan. In view of our ultimate decision, we need not pass on this point.

Aetna further argues that even if there was a loss, and such loss was due to fraud on the part of Cudd or Coan or both of them, there still can be no recovery for these write-offs because Cudd and Coan were not "Employees" of Underwriters within the meaning of the bond.

"Employees" covered by the bond were defined (see I above) as "officers, clerks and other natural persons in the service of the insured * * * who are compensated by salary, wages or commissions, and whom the Insured has the right to govern and direct at all times in the performance of such service * * ". Cudd and Coan were officers of Underwriters and received salaries from it. Not only were they the principal officers of Underwriters, they were also its only directors and owned 75% of its stock, the remainder being held by a private corporation which they owned.

■■ As shareholders of Underwriters, Cudd and Coan elected themselves its sole directors, and as directors they elected themselves its chief executive officers. Since the charter gave the directors the right to manage and control the corporation, Cudd and Coan as directors probably had the technical right to control Cudd and Coan as officers. But such a theoretical and unrealistic right of control did not make Cudd and Coan "Employees" of Underwriters covered by the bond. Such a bond is not intended to cover the fraud and dishonesty of men who are in effect the sole stockholders, as well as the only directors of a closely held corporation. As noted above, the bond is intended to protect the corporation from the fraud or dishonesty of its employees, not to protect its creditors

---

7. On December 31, 1959, Cudd's insurance account was credited with $6,225.33, and two additional credits of $3,619.61 each were made on May 19, 1961, and May 22, 1961. These entries amounted to a total write-off of $13,464.55. A similar credit of $2,121.88 was given to Coan on January 31, 1960. The following year Underwriters paid $836.80 for premiums on Coan's personal insurance and charged them directly to insurance expense rather than to Coan. This sum of $2,958.68 paid on Coan's personal insurance, when added to that paid for Cudd, represents the total recovery Judge Martin allowed. As to $1,631.75 which was credited to the insurance account of Cudd on June 27, 1961, and which is claimed by the Receiver, Judge Martin found plaintiff's proof insufficient and denied recovery thereon.

from the fraud or dishonesty of its stockholders and directors. We cannot agree with the District Judge that the claimed loss as a result of the write-off of the debits resulted from the activities of Cudd and Coan as "Employees" of Underwriters.

This conclusion makes it unnecessary for us to pass on the other issues raised by Aetna, set out in note 6, above.

### VII

We intimate no opinion on any of the issues raised but not decided in any of the four cases.

The judgments in the National Discount, Title and National Fidelity cases are affirmed. The judgment in the Underwriters case is reversed insofar as it allowed recovery for $16,423.98; otherwise it is affirmed.

Affirmed in part; reversed in part.