**FORT SMITH TOBACCO & CANDY COMPANY, Plaintiff,**

v.

**AMERICAN GUARANTEE AND LIABILITY INSURANCE COMPANY, Defendant.**

**No. 1585.**

United States District Court
W. D. Arkansas,
Fort Smith Division.

Sept. 5, 1962.

the case was removed to this court by the defendant.

The plaintiff seeks to recover judgment against the defendant under the provisions of a Comprehensive Dishonesty, Disappearance and Destruction Policy, issued by defendant effective February 1, 1959, for loss of money and other property sustained through the fraudulent or dishonest act of an employee of the plaintiff.

The plaintiff alleged that the policy was in full force and effect and that the plaintiff sustained the loss of money and property "as a result of the fraudulent or dishonest act of an employee in the amount of $23,684.86, after allowing credit for all recoveries." That the plaintiff has complied with all the provisions of the policy and has made demand upon the defendant for the payment of the loss in accordance with the provisions of the policy of insurance, but defendant has failed and neglected to perform its obligations under the contract.

It prayed judgment for the sum of $20,000, the maximum amount of liability stated in the policy, together with a penalty of 12 percent and a reasonable attorney's fee.

On April 19, 1961, defendant filed its answer in which it denied, "that when said policy of insurance was in full force and effect, plaintiff sustained a loss of money and property, as a result of a fraudulent or dishonest act of an employee, in the amount of $23,684.86, after allowing credit for all recoveries or any other sum."

Denied that the plaintiff has complied with the provisions of the policy and that plaintiff has made demand upon defendant for the payment of said loss in accordance with the provisions of the policy.

Bethell & Pearce, Fort Smith, Ark., for plaintiff.

Harper, Harper, Young & Durden, Fort Smith, Ark., for defendant.

JOHN E. MILLER, Chief Judge.

On March 15, 1961, the plaintiff filed its complaint in the Sebastian Circuit Court, Fort Smith District. In due time

The defendant further alleged in paragraph No. 1 of the answer that plaintiff's complaint "fails to state a claim upon which relief can be granted."

The plaintiff, Fort Smith Tobacco & Candy Company, is a corporation incorporated under the laws of the State of Arkansas with its principal office and

place of business in Fort Smith, Arkansas.

The defendant, American Guarantee and Liability Insurance Company, is a corporation engaged in the insurance business, organized and existing under the laws of the State of New York with its principal office and place of business in Chicago, Illinois, and is authorized to engage in business in Arkansas.

The court has jurisdiction because of diversity of citizenship of the parties and the amount involved.

Fort Smith Tobacco & Candy Company, hereinafter called the plaintiff, is presently and has been engaged in the wholesale business and distribution of cigarettes, tobacco, cigars, candy, appliances, drugs and sundries, and miscellaneous items in the Fort Smith trade area since 1940. Although the plaintiff is a separate corporation, it is a subsidiary of the Mid-Continent Wholesale Company, located at Denver, Colorado, which, as the parent organization, functions as an accounts payable office and supervises all business actions and activities of the plaintiff. Mr. J. H. Friedman has been since the organization of plaintiff, and is presently, President and Manager. However, he has no official capacity with Mid-Continent Wholesale Company, even though the two corporations are affiliated and have common ownership to some extent.

The defendant, through its Denver Agency Company, issued its Comprehensive Dishonesty, Disappearance and Destruction Policy, No. 1310259, to Mid-Continent Wholesale Company, which policy became effective at noon February 1, 1959, and was in full force and effect from that date. In an endorsement attached thereto, the name of the insured was amended to include the plaintiff along with fifteen other subsidiaries of Mid-Continent Wholesale Company.

This policy replaced a prior policy issued by the Indemnity Insurance Company of North America, which had been in effect from July 1, 1957, to the beginning of the period that the defendant's policy became effective at noon on February 1, 1959.

On April 19, 1961, simultaneously with the filing of its answer, the defendant submitted certain interrogatories to the plaintiff in accordance with the provisions of Rule 33, Fed.R.Civ.P., 28 U.S.C. A.

On May 9, 1961, the plaintiff responded to the interrogatories and stated that, according to the plaintiff's best information and belief, the loss complained of was as follows:

| | |
|---|---|
| Cigarettes | $ 5,672.77 |
| Drugs and sundries | 1,215.23 |
| Appliances | 7,388.13 |
| Miscellaneous items | 3,193.63 |
| Fort Chaffee account | 6,215.10 |
| Cash collections | 2,851.65 |
| Total | $26,536.51 |

That the fact that a loss had occurred was discovered on or about September 15, 1959, but the plaintiff does not know exactly when it occurred. The extent of the loss claimed was not fully discovered until an audit was completed sometime after October 23, 1959.

That plaintiff was repaid the sum of $2,851.65 by Robert D. Hardcastle, the employee described in paragraph 3 of plaintiff's complaint. (The plaintiff alleged that Mr. Hardcastle was the employee "whose fraudulent or dishonest act" caused the alleged loss.)

That proof of loss was furnished to defendant on or about September 21, 1959, through its representative who was authorized to investigate and adjust the loss. A copy of the document referred to as "proof of loss" was attached to the response and will be referred to hereinafter.

The plaintiff further stated, "Proof of part of the loss will be supported both as to its existence and as to its amount by inventory computations through comparing amounts as reported by Mr. Hardcastle with quantities actually found to be on hand, coupled with his admissions.

of falsification and alteration of reports and inventories."

On June 1, 1962, plaintiff propounded to defendant certain interrogatories under the provisions of Rule 33, Fed.R.Civ. P., which were responded to by defendant on June 19, 1962. In answer to the interrogatories, the defendant stated that the plaintiff had not submitted adequate proof of employee dishonesty, nor adequate proof that the loss claimed occurred while the policy in question was in force. The defendant further stated:

"It appears that any loss claimed by plaintiff occurred prior to the effective date of the policy involved and at a time when other insurance was in force to cover the alleged loss, which was admittedly discovered within time to have allowed plaintiff to make claim under such other insurance.

"It appears that any loss claimed cannot be established except by an inventory computation, and therefore the same is excluded from the policy under Section 2(b)."

The interrogatories were answered for defendant by J. T. Whalen, who stated that he did not know exactly the date upon which the plaintiff was advised that one of the defenses would be that the loss was covered by a prior bond or policy. Neither did the defendant know when the plaintiff was first notified that defendant was denying liability under the policy.

By interrogatory No. 5 the defendant was requested to advise the date upon which it first notified plaintiff that it was denying liability and to state the manner in which such denial was made known to the plaintiff and the circumstances pertaining thereto.

Interrogatory No. 6 referred to a letter dated April 28, 1960, addressed to James T. Whalen, Zurich Insurance Co., 135 So. LaSalle Street, Chicago, Ill., and signed Denver Agency Company by Patricia Muhr, Claim Department, in which letter the Denver Agency stated:

"Your Denver Claims office referred us to you for information regarding the above claim. According to information we have received, this claim has been denied. But nothing written has ever been received on this; evidently any denial made was made verbally.

"Would you be good enough to write Ft. Smith Tobacco Company denying the claim officially and send a carbon copy of the letter of Mr. Bershof of Mid-Continent Wholesale Company and another carbon to the Denver Agency Company. If this claim has not been denied, please send the above letter with a status report."

Interrogatory No. 7 referred to a letter dated May 4, 1960, from J. T. Whalen, Claim Department of the Zurich Insurance Company, addressed to Miss Patricia Muhr, Claim Department, the Denver Agency, in which he stated:

"We received your letter dated April 28, 1960. When we received notice of this loss by telephone from our Denver Branch Office, we referred the matter to Casualty Adjustment Company for the purpose of conducting an investigation in our behalf. Mr. Bradney of that firm undertook to handle the claim. Shortly thereafter this same insured reported another loss involving an employee by the name of Ralph R. Guthray and Mr. Bradney likewise handled that claim which came to a conclusion that was satisfactory to the insured within a reasonable time.

"This matter involving Robert D. Hardcastle was more complicated because Hardcastle took the position that he was responsible for a definite amount of loss that he had computed or had kept a record of while his dishonest acts were in progress. The insured at that time discovered a substantial inventory shortage and felt that Hardcastle was fully responsible for that condition. I recall talking to Mr. Bradney on a couple of different occasions concerning the progress of his investigation and we were promised a full report as soon

as all of the investigation could be completed. Regardless of our inquiries considerable time passed by before we received a report on April 26, 1960, advising that Mr. Bradney was no longer with the firm and that his services had been terminated because of his dereliction of his duties. Unfortunately this case was among those that were neglected. The Casualty Adjustment Company is now endeavoring to put this file in the best possible shape to give us the benefit of the investigation that was done. We hope to know more about the entire situation within the next few weeks.

"In view of the circumstances outlined above, we do not consider it advisable to write to the insured along the lines you mentioned until we are more certain that such correspondence would be appropriate."

In the interrogatory the defendant was asked if the above letter was written in behalf of the defendant and also to state the relationship of Zurich Insurance Company to the defendant. In answer to interrogatories 5, 6 and 7, the defendant stated:

"On September 15, 1960, a letter was addressed to the Denver Agency Company authorizing it to notify Mr. Bershof that there was no evidence to support a claim for any loss that occurred after February 1, 1959.";

but that it did not know on what date the Denver Agency Company may have notified Mr. Bershof as authorized. (Mr. Bershof was an official of Mid-Continent Wholesale Company, the parent company of plaintiff.)

Defendant, through Mr. J. T. Whalen, further stated in response to interrogatories 6 and 7.

"The letter dated April 28, 1960, was received and recognized as a subject matter for American Guarantee & Liability Insurance Company. The Denver Agency Company was an agent for the American Guarantee & Liability Insurance Company at that time.

"A letter dated May 4, 1960, was addressed to the Denver Agency Company in behalf of American Guarantee & Liability Insurance Company which is an affiliate of Zurich Insurance Company."

The policy issued by defendant and upon which plaintiff bases its claim provides, inter alia, in Item 3 that the limit of liability under Insuring Agreement No. I, Employee Dishonesty Coverage—Form 5, is $20,000.

The policy further provides:

"The Company, in consideration of the payment of the premium, and subject to the Declarations made a part hereof, the General Agreements, Conditions and Limitations and other terms of this Policy, agrees with the insured, in accordance with such of the insuring agreements hereof as are specifically designated by the insertion of an amount of insurance in the Table of Limits of Liability, to pay the Insured for:

"INSURING AGREEMENTS
"EMPLOYEE DISHONESTY
COVERAGE—FORM B

"I. Loss of Money, Securities and other property which the Insured shall sustain through any fraudulent or dishonest act or acts committed by any of the Employees, acting alone or in collusion with others, the amount of insurance on each of such Employees being the amount stated in the Table of Limits of Liability applicable to this Insuring Agreement I.

\* \* \* \* \* \*

"GENERAL AGREEMENTS
"*Loss Under Prior Bond or Policy*

"C. If the coverage of an Insuring Agreement of this Policy, other than Insuring Agreement V, is substituted for any prior bond or policy of insurance carried by the Insured or by any predecessor in interest of the Insured, which prior

bond or policy is terminated, canceled or allowed to expire as of the time of such substitution, the Company agrees that such Insuring Agreement applies to loss which is discovered as provided in Section 1 of the Conditions and Limitations and which would have been recoverable by the Insured or such predecessor under such prior bond or policy except for the fact that the time within which to discover loss thereunder had expired; provided:

"(1) the insurance under this General Agreement C shall be a part of and not in addition to the amount of insurance afforded by the applicable Insuring Agreement of this Policy;

"(2) such loss would have been covered under such Insuring Agreement had such Insuring Agreement with its agreements, conditions and limitations as of the time of such substitution been in force when the acts or events causing such loss were committed or occurred; and

"(3) recovery under such Insuring Agreement on account of such loss shall in no event exceed the amount which would have been recoverable under such Insuring Agreement in the amount for which it is written as of the time of such substitution, had such Insuring Agreement been in force when such acts or events were committed or occurred, or the amount which would have been recoverable under such prior bond or policy had such prior bond or policy continued in force until the discovery of such loss, if the latter amounts be smaller."

Under Conditions and Limitations the policy provides:

"Section 1. Loss is covered under Insuring Agreement I of this Policy only if discovered not later than two years from the end of the Policy Period. Except under Insuring Agreement I, loss is covered under this Policy only if discovered not later than one year from the end of the Policy Period.

"Subject to General Agreement C:

\* \* \* \* \* \*

"(b) Insuring Agreement I applies only to loss sustained by the Insured through fraudulent or dishonest acts committed during the Policy Period by any of the Employees engaged in the regular service of the Insured within the territory designated above or while such Employees are elsewhere for a limited period;"

Section 2(b) under Exclusions reads:

*"Exclusions*

"Section 2. This Policy does not apply:

\* \* \* \* \* \*

"(b) under Insuring Agreement I, to loss, or to that part of any loss, as the case may be, the proof of which, either as to its factual existence or as to its amount, is dependent upon an inventory computation or a profit and loss computation; provided, however, that this paragraph shall not apply to loss of Money, Securities or other property which the Insured can prove through evidence wholly apart from such computations, is sustained by the Insured through any fraudulent or dishonest act or acts committed by any one or more of the Employees;"

Section 4 reads:

*"Loss Caused by Unidentifiable Employees*

"Section 4. If a loss is alleged to have been caused by the fraud or dishonesty of any one or more of the Employees and the Insured shall be unable to designate the specific Employee or Employees causing such loss, the Insured shall nevertheless have the benefit of Insuring Agreement I, subject to the provisions of Section 2(b) of this Policy, provided that the evidence submitted reasonably proves that the loss was in fact

due to the fraud or dishonesty of one or more of the said Employees, and provided, further, that the aggregate liability of the Company for any such loss shall not exceed the Limit of Liability applicable to Insuring Agreement I."

Section 8 reads:

*"Loss – Notice – Proof – Action Against Company*

"Section 8. Upon knowledge or discovery of loss or of an occurrence which may give rise to a claim for loss, the Insured shall: (a) give notice thereof as soon as practicable to the Company or any of its authorized agents and, except under Insuring Agreements I and V, also to the police if the loss is due to a violation of law; (b) file detailed proof of loss, duly sworn to, with the Company within four months after the discovery of loss.

\* \* \* \* \* \*

"Upon the Company's request, the Insured shall submit to examination by the Company, subscribe the same, under oath if required, and produce for the Company's examination all pertinent records, all at such reasonable times and places as the Company shall designate, and shall cooperate with the Company in all matters pertaining to loss or claims with respect thereto.

"No action shall lie against the Company unless, as a condition precedent thereto, there shall have been full compliance with all the terms of this Policy, \* \* \*"

Section 12 states:

*"Limit of Liability Under This Policy and Prior Insurance*

"Section 12. This Section shall apply only to Insuring Agreements I and V.

"With respect to loss caused by any person (whether one of the Employees or not) or which is chargeable to any Employee as provided in Section 4 and which occurs partly during the Policy Period and partly during the period of other bonds or policies issued by the Company to the Insured or to any predecessor in interest of the Insured and terminated or canceled or allowed to expire and in which the period for discovery has not expired at the time any such loss thereunder is discovered, the total liability of the Company under this Policy and under such other bonds or policies shall not exceed, in the aggregate, the amount carried under the applicable Insuring Agreement of this Policy on such loss or the amount available to the Insured under such other bonds or policies, as limited by the terms and conditions thereof, for any such loss, if the latter amount be the larger."

The provisions of the prior policy issued by Indemnity Insurance Company of North America, and which was in force and effect from July 1, 1957, to February 1, 1959, are similar to the provisions of the policy sued upon as hereinbefore set forth. The only relevant difference appears in the following provision of the prior policy:

*"Policy Period, Territory, Discovery*

"Section 1. Loss is covered under this Policy only if discovered not later than one year from the end of the Policy Period. Subject to General Agreement C:

\* \* \* \* \* \*

"(b) Insuring Agreement I applies only to loss sustained by the Insured through fraudulent or dishonest acts committed during the Policy Period by any of the Employees engaged in the regular service of the Insured within the territory designated above or while such Employees are elsewhere for a limited period."

The occasion which precipitated plaintiff's discovery of its alleged loss occurred in the following manner.

Plaintiff had a running account with the Post Exchange at Fort Chaffee. After the Fort closed, there remained

on the account books of plaintiff an unpaid balance in this account. Several letters of inquiry were directed to the Atlanta Service Center, Army and Air Force Exchange Service in Atlanta, Georgia. No replies having been received from the inquiries, Mr. Friedman on September 14, 1959, made a phone call to Atlanta, inquiring why the account had not been paid. The chief of the accounting section agreed to investigate the account and to advise by phone later the same day. Mr. Hardcastle knew this telephone call had been made. After making a bank deposit, he returned to the office of the plaintiff briefly, then left without explanation and did not return that day. Later in the same day there was a report from Atlanta that the records of that office showed that the Fort Chaffee account had been paid in full.

On the next day, September 15, Mrs. Hays, an employee of Fort Smith Tobacco & Candy Company, was instructed by Mr. Friedman to complete the cigarette report for the week ending September 5, and to begin preparation of the report for the week ending September 12, since the reports were a week in arrears. She was not able to complete the report for September 5, but Mr. Hardcastle, who had returned to work that day, took the report and finished it. Later that evening, Mr. Friedman found some collection reports in Mr. Hardcastle's desk which normally accompanied cash collections by salesmen and were necessary for the purpose of crediting the proper accounts. The following morning Mr. Friedman checked the accounts of customers, and found that none of the accounts had been credited with the collection items reflected on the collection reports found in Mr. Hardcastle's desk.

On the morning of the 16th of September, Mrs. Hays informed Mr. Friedman that according to her calculations the report of the week ending September 5, which Mr. Hardcastle had completed the preceding day and which had been mailed to Denver, did not appear to be correct. Mr. Hardcastle was then questioned by Mr. Friedman about the cigarette report for the week ending September 5, and he admitted changing the figures in order to force a balance on that report, which showed an overage of 600 cigarettes. He was then questioned about the collection reports found in his desk, and he admitted taking that money for his own use. At that time he promised Mr. Friedman that he would pay to plaintiff the amount, which he subsequently did two days later, on September 18, 1959, with a check signed by his father in the sum of $2,851.65. Mr. Friedman also asked him if he had taken any cigarettes, and he denied taking any cigarettes or any other merchandise from the plaintiff.

Mr. Friedman then instructed Mrs. Hays to make up the weekly cigarette report for the week ending September 12 and upon her completion of the report it disclosed that there was a shortage of 864,000 cigarettes, or 4,320 cartons, with a value of approximately $9,000. Mr. Friedman then informed Mr. Hardcastle of this shortage, and Mr. Hardcastle denied having any knowledge as to what happened to the cigarettes and reiterated that the only reason that he had changed the weekly cigarette reports was because he could not make them balance in any other way.

On the morning of September 17, Mr. Friedman called Mr. Hardcastle into his office, after first having reviewed the annual house inventory which both of them had taken on August 1, 1959, but which had not yet been completed for final totaling. Upon being asked whether he had changed any figures on the August 1 inventory, Hardcastle replied that he had changed certain figures entered by Friedman on the cigarette portion of the inventory, changing both the original and the duplicate copies which Friedman had personally written up.

Mr. Hardcastle was employed by the plaintiff from 1950 to October 1959 as office manager. His specific duties included superintending the bookkeeping, accounts and compilation of inventories; the handling of all the details incident

to the conduct of plaintiff's business; the deposits of the cash receipts and compiling of weekly reports to the parent corporation, which were required to be sent to the Mid-Continent Wholesale Company. Mr. Friedman, the President, took no active part in the actual computation of the weekly physical and book inventories other than to check the totals in order to see how closely they were in balance.

The plaintiff makes no claim, in its effort to recover the alleged loss, that any of its employees other than Robert D. Hardcastle was guilty of fraudulent and dishonest acts that resulted in a loss of money or property.

The only evidence as to when or how shortages occurred appears in the testimony of Mr. Hardcastle. In October 1958 he discovered that the cigarette inventory showed a loss. He did not report the loss to the President of the plaintiff because he thought that he would be able to ascertain when and how the loss occurred, but the losses kept mounting, and in an effort to conceal the loss until the cause of it could be ascertained, he began changing the weekly reports in such a manner as to show that more cigarettes were actually on hand than the calculation of the inventory disclosed. Mr. Hardcastle made changes not only in the weekly reports of cigarettes but also in the totals of the cigarette inventories from October 1958 to September 1959. For instance, the total in the inventory of January 17, 1959, was changed by him to cover shortages that had occurred prior to that time.

There also seems to have been some slight shortages in the inventories other than in the cigarette category, but they appear to have been small and could well have been the result of bookkeeping errors.

Mr. Friedman reported the loss to the parent company, Mid-Continent Wholesale Company, and on September 21, 1959, he was interviewed by a Mr. Bradney of the Casualty Adjustment Company, who secured a statement dictated by Mr. Friedman of the circumstances surrounding the discovery of the loss. At that time the only losses of which Mr. Friedman had knowledge were in the Army and Air Force Post Exchange Account at Fort Chaffee, the alteration of the annual cigarette inventory of August 1, 1959, and an undetermined number of the weekly receipts of cigarettes and the accounts receivable for sale of cigarettes.

Mr. Friedman personally took an annual physical inventory on September 26, 1959, in which he used the annual inventory taken August 1, 1958, as the starting inventory and computed a loss of $5,672.77 worth of cigarettes, which could not be accounted for, representing a difference between the physical and book inventory totals.

J. L. Swofford & Company, Certified Public Accountants, were employed by plaintiff and commenced an audit of the plaintiff's inventory on October 23, 1959, to ascertain the loss sustained in plaintiff's inventory during the period August 1, 1958, to September 18, 1959.

On March 31, 1960, Mr. Friedman addressed the following letter to the Casualty Adjustment Company, who had conducted the investigation of plaintiff's loss on behalf of the defendant·

"Gentlemen:

"We have furnished all information previously requested by you pertaining to the loss suffered by Fort Smith Tobacco and Candy Company as a result of the dishonesty of our former employee, Robert D. Hardcastle. We have heard nothing from you with respect to our claim, and request that you advise immediately if there is anything further required before you put our claim in line for payment.

"Since last discussing the matter with your representative, we have caused our records to be subjected to a detailed audit by Swofford & Company, Certified Public Accountants, for the purpose of ascertaining as accurately as possible the extent and nature of the loss.

"That audit discloses the following items of shortage:

| | |
|---|---|
| Cigarettes | $ 5,672.77 |
| Drugs and sundries | 1,215.23 |
| Appliances | 7,388.13 |
| Miscellaneous items | 3,193.63 |
| Camp Chaffee account | 6,215.10 |
| | $23,684.86 |

"We have previously furnished you with a detailed statement of the facts and circumstances of this loss to the extent that they were known on September 21, 1959, and we request your prompt consideration of our claim. If there is anything further required, please advise."

On June 29, 1960, the defendant replied to plaintiff's letter of March 31, 1960, and, inter alia, made the following statement:

"As you know our Comprehensive Dishonesty, Destruction and Disappearance Policy became effective February 1, 1959. The information that you have submitted does not properly establish or prove what amount if any of your alleged loss in the sum of $23,684.86 was caused by employee dishonesty or after the effective date of our coverage. In this regard we must reserve all rights and defenses which pertain to the Agreements, Conditions and Limitations of our policy.

"With the understanding that all rights under our policy are fully reserved, we are willing to examine the Swofford & Company audit report and make any other appropriate investigation that might have any mutual benefit for your company and our company. If you are in agreement, you may immediately contact Mr. Frank Birch of Casualty Adjustment Company who will receive a copy of this letter. Awaiting further word from you in this regard, we remain," (PX 12.)

Mr. Freidman received no further direct communication from the defendant. However, on September 15, 1960, the defendant addressed a letter to its Denver agency authorizing it to notify the Mid-Continent Wholesale Company that there was no evidence to support a claim for any loss sustained by the plaintiff that occurred after February 1, 1959.

In the meantime, the defendant had commissioned Douglas Walker & Co., Certified Public Accountants, to conduct a complete audit of the plaintiff's inventory for the period beginning August 2, 1958, and ending September 26, 1959. On March 20, 1962, Douglas Walker & Company submitted its final report to the defendant which, inter alia, stated:

"We have examined the records of the Fort Smith Tobacco and Candy Company, Inc., Fort Smith, Arkansas as set forth in this letter to determine whether an inventory loss can be determined independently of an inventory computation for the period beginning February 1, 1959 and ending September 26, 1959.

"Our examination included a test-check of the sales, cost of sales, salesmen's load sheets, merchandise purchases reports, merchandise receiving reports, merchandise inventory records, and supporting data to determine the method by which the company arrived at its inventory loss claim and to determine whether an inventory computation was necessary to arrive at an inventory loss.

"An examination of the company claim revealed that it is based upon an inventory computation covering the period beginning August 2, 1958 through September 26, 1959. The closest date to February 1, 1959 for which a complete inventory of the company was available was an inventory taken on January 17, 1959. By using this inventory and the same figures and data from which the company prepared its claim, the computed inventory loss for the period beginning January 18, 1959 through September 26, 1959 was $8,303.00 as shown in the attached schedule.

"An inventory computation is an inventory arrived at by taking a beginning inventory, adding purchases and deducting the cost of merchandise sold. A computed inventory loss, therefore, would be the difference arrived at by deducting an actual inventory from the inventory computation. This is the method by which the company arrived at its claim and the method used to determine the $8,303.00 computed inventory loss referred to in the preceding paragraph.

\* \* \* \* \* \*

"In our opinion an inventory loss cannot be determined from the company records independently of an inventory computation for the period beginning February 1, 1959 and ending September 26, 1959."

The next page contains the computation, which is set forth verbatim as follows:

### FORT SMITH TOBACCO AND CANDY COMPANY, INC.
#### RECONCILIATION OF INVENTORY LOSS COMPUTATIONS
#### FOR PERIOD BEGINNING AUGUST 2, 1958 THROUGH JANUARY 17, 1959 AND PERIOD BEGINNING JANUARY 18, 1959 THROUGH SEPTEMBER 26, 1959 TO THE COMPUTED INVENTORY LOSS
#### CLAIM OF THE COMPANY

| | Cigarettes | Drugs Sundries | Appliances | Miscellaneous | Total |
|---|---|---|---|---|---|
| Computed Inventory Loss for Period Beginning August 2, 1958 Through January 17, 1959 | $1,296.47 | $ 351.31 | $4,104.89 | $1,699.39 | $ 7,452.06 |
| Computed Inventory Loss for Period Beginning January 18, 1959 Through September 26, 1959 | 4,023.82 | 708.69 | 2,705.74 | 864.75 | 8,303.00 |
| | $5,320.29 | $1,060.00 | $6,810.63 | $2,564.14 | $15,755.06 |
| Add: Salesmen Shortages | $ 352.48 | $ 34.04 | $ 163.41 | $ 138.43 | $ 688.36 |
| 2% Inventory Discount Taken | | 121.15 | 414.09 | 502.93 | 1,038.17 |
| | $ 352.48 | $ 155.19 | $ 577.50 | $ 641.36 | $ 1,726.53 |
| | $5,672.77 | $1,215.19 | $7,388.13 | $3,205.50 | $17,481.59 |
| Differences | | 04 | | ( 01) | 03 |
| Computed Inventory Loss per Company Claim | $5,672.77 | $1,215.23 | $7,388.13 | $3,205.49 | $17,481.62 |

The total of $23,684.86 determined by the audit conducted by Swofford & Company and the total shortage of $17,481.62 determined by Douglas Walker & Company can be reconciled by subtracting the sum of $6,215.10 which was the amount that originally could not be accounted for in the Fort Chaffee account from Swofford's total of $23,684.86, since the records of the Army and Air Force Post Exchange in Atlanta, Georgia, establish that the amount had been paid to the plaintiff in satisfaction of that account. The elimination of the Fort Chaffee account leaves a difference of only $11.86 under "Miscellaneous Items."

As to the method by which the cigarettes were handled at the plaintiff's place of business, there is a special room built inside the building in which the cigarettes are stored. This room was kept locked during the night hours and the key was kept in Mr. Hardcastle's desk. The orders were filled from the cigarette room from the salesmen's load sheets, which load sheets, as made up by the salesmen, were in fact a form of requisition. The cigarettes as well as other items were checked out either by Mr. Hardcastle or by Mr. Friedman, and the salesman signed a receipt for the merchandise and became responsible for any shortages that appeared when he returned from his route. At the time of the annual inventory the cigarettes in the salesmen's trucks were inventoried along with those stored in the plaintiff's building.

All uncompensated losses claimed by the plaintiff have been directly established by an inventory computation. Hardcastle is implicated with the loss of approximately $5,320.29 worth of cigarettes during the period August 2, 1958, to September 26, 1959, in that he altered the figures that Mr. Friedman had entered in the physical inventory of August 1, 1959; he forced a balance of the weekly inventory ending August 5, 1959; he failed to compute inventory sheet totals of weekly cigarette inventories after February 28, 1958, and entered fictitious totals in order to make the weekly inventories balance; and he was unable to account for the whereabouts of the individual files of the weekly cigarette inventories covering a period of 21 weeks in 1959, which had been computed by him and which should have been in his exclusive possession.

Mr. Hardcastle admitted his alteration of the physical annual cigarette inventory of August 1, 1959, which had been conducted by Mr. Friedman in order to make the section tabulating the cigarette inventory balance, and he has also admitted his alteration of individual weekly cigarette inventories during 1959 in order to make them balance. Furthermore, he has admitted his failure to enter actual computed totals in the work sheets used in his weekly cigarette inventories conducted after February 28, 1959.

However, Mr. Hardcastle has steadfastly denied any knowledge of the disposition of the missing cigarettes or of how the discrepancies in the other inventory categories may have arisen.

The plaintiff has not caused any criminal charges to be filed against Mr. Hardcastle, nor has it brought a civil suit to recover the value of the missing inventory against Hardcastle, although Mr. Friedman did notify the Sheriff of Sebastian County of the claimed losses.

Mr. Louis Swofford, an employee of J. L. Swofford & Co., did not file with the plaintiff any formal statement of the affairs of the plaintiff as found by him, but did testify. Apparently when J. L. Swofford & Co. were employed by plaintiff to audit the books, records, etc., the plaintiff was unaware of any loss in the inventories of the drugs and sundries, the appliances, and miscellaneous items. The only proof of any loss in any of those three inventories depended upon the inventories that had previously been taken and the condition of the business on September 21, 1959. Mr. Hardcastle in his testimony admitted that he made "minor changes" in the totals of the inventories of drugs, sundries, appliances and miscellaneous items.

Mr. Swofford testified positively that the Fort Chaffee account had been paid in full and the payments were deposited in the bank account of the plaintiff. The plaintiff did not offer any proof to establish the source of the $2,851.65, which Mr. Hardcastle embezzled and which he repaid to the plaintiff, other than it comprised funds that had been collected and which should have been credited to the account of the debtors who made the payments. Actually the court does not know whether that sum represents money that was due plaintiff from the sale of cigarettes or from some other type of merchandise.

As heretofore referred to, plaintiff on June 1, 1962, submitted the following interrogatory to defendant:

"1. What defenses are you making or claiming to liability upon your insurance policy upon which suit is brought herein?"

The defendant on June 19, 1962, answered the interrogatory as follows:

"1. (1) Plaintiff has not submitted adequate proof of employee dishonesty.

"(2) Plaintiff has not submitted adequate proof that the losses claimed occurred while the policy in question was in force.

"(3) It appears that any loss claimed by plaintiff occurred prior to the effective date of the policy involved and at a time when other insurance was in force to cover the alleged loss, which was admittedly discovered within time to have allowed plaintiff to make claim under such other insurance.

"(4) It appears that any loss claimed cannot be established except by an inventory computation, and therefore the same is excluded from the policy under Section 2(b)."

The plaintiff on its brief contends that it has submitted (1) adequate proof of employee dishonesty; (2) adequate proof that the loss occurred while the policy in question was in force; (3) that the defendant's detailed audit shows that $11,-154.65 of the loss occurred while the policy sued upon was in force, comprising $8,303.00 in inventory loss and $2,851.65 in cash embezzlement; (4) that the defendant "by its conduct (or misconduct) through its agent is responsible for the entire loss being an additional sum of $7,452.06 in inventory losses plus $6,215.-10 for the Fort Chaffee account or a total, using the defendant's audit figures, of $21,970.16," which is subject to the policy limitation of $20,000.00; (5) that the defendant is estopped from making any defense because of the manner in which the defendant through its adjuster processed and handled the claim of the plaintiff.

The defendant on its brief makes no contention that the plaintiff did not make timely proof of its claim, but strenuously contends that the plaintiff has not established by adequate proof that the losses claimed are covered by the policy sued upon.

The plaintiff does not contend that the policy is ambiguous in any respect.

In 29 Am.Jur., Insurance, Sec. 260, p. 644, it is said:

"The rule of construction favorable to the insured does not conflict with the rule that contracts of insurance should be construed so as to carry out the true intentions of the parties, since it applies only when there is ambiguity so that the intent is not clear. Conversely stated, the rule of strict construction against the insurer does not apply where the language used in the policy is so plain and unambiguous as to leave no room for construction * *. Furthermore, the rule of strict construction against the insurer does not authorize the distortion or perversion of the language used in an insurance contract, nor does it furnish any warrant for creating an ambiguity where none otherwise exists, and the rule that the language of an insurance policy is to be construed most strongly against the insurer is no justification for giving one mean-

ing to a term therein when defining it for the benefit of the insured and another when it is invoked by the insurer."

■ The parties are bound by the terms of the policy. In Montgomery v. M. F. A. Mutual Ins. Co., (8 Cir. 1957) 250 F.2d 357, the late Judge Gardner, writing for the court, at page 360, said:

"There is no claimed ambiguity in the provisions of the policy and confessedly the parties had the right to contract for such limitations or conditions of liability as might be agreed upon. As said by the Supreme Court of Arkansas in Sun Mut. Ins. Co. v. Dudley, 65 Ark. 240, 45 S.W. 539, 542:

"'An insurance company has the right to judge and act for itself as to the conditions upon which it will insure against losses by fire or other causes. The owner of property is not bound to accept insurance upon any particular conditions, but, if he does, he cannot defend against a breach thereof upon the ground they are immaterial. Having entered into the contract of insurance as evidenced by its policy, the insurance company has the right to rely and insist upon all its terms and conditions, and take advantage of all forfeitures incurred by the breach of any of its conditions.'"

■ The burden of proof was upon plaintiff to prove its right to recover under the terms of the policy. In Southern Mut. Life Ins. Co. v. Perry, (1920) 144 Ark. 512, at page 514, 222 S.W. 1067, at page 1068, the court said:

"The burden was upon the appellee to prove that she was entitled to recover under the contract of insurance."

In 50 Am.Jur., Suretyship, Sec. 357, p. 1139, the learned authors elaborate on the rule as follows:

"In accordance with the general rule that the burden is on the plaintiff to prove the facts essential to his cause of action, the burden of proof is on the plaintiff to establish loss under the fidelity bond; that the loss was caused by an act or default of the employee whose fidelity is insured within the terms of the bond; that the loss was sustained while the bond was in force; and that there was a causal connection between the act or default and the loss sustained."

Insuring Agreement I insured the plaintiff against loss "which the insured shall sustain through any fraudulent or dishonest act or acts committed by any of the employees."

Under Exclusions, Sec. 2(b), the policy does not apply as to loss or that part of any loss, "the proof of which, either as to its factual existence or as to its amount, is dependent upon an inventory computation or a profit and loss computation; provided, however, that this paragraph shall not apply to loss of money, securities or other property which the insured can prove, through evidence wholly apart from such computations, is sustained by the insured through any fraudulent or dishonest act or acts committed by any one or more of its employees."

Section 4 of the policy provides that if a loss is alleged to have been caused by the fraud or dishonesty of any one or more unidentified employees, "the insured shall nevertheless have the benefit of Insuring Agreement I, subject to the provisions of Sec. 2(b) of this policy, provided that the evidence submitted reasonably proves that the loss was in fact due to the fraud or dishonesty of one or more of said employees, * * *."

The policy further provides that Agreement I applies only to loss sustained by the insured through fraudulent or dishonest acts committed during the policy period. "Except under Insuring Agreement I, loss is covered under this policy only if discovered not later than one year from the end of the Policy Period."

■ Fraud is never presumed, and under the provisions of the policy sued upon, the plaintiff cannot recover for any

claim based upon inventory computation, but the policy does not provide that the plaintiff is precluded from introducing inventory computations. However, before it can recover it must produce "evidence wholly apart from such computations" which "reasonably proves that the loss was in fact due to the fraud or dishonesty of one or more of the said employees."

■ It is firmly established in Arkansas that "conjecture and speculation, however plausible, will not be permitted to satisfy the place of proof." What appears to be the most recent exposition of this principle is found in Farr v. Traders & General Ins. Co., 235 Ark. 185, 357 S. W.2d 544 which cites Mo. Pac. R. R. Co. v. Ross, 194 Ark. 877, 109 S.W.2d 1246, and Glidewell v. Arkhola Sand & Gravel Co., 212 Ark. 838, 208 S.W.2d 4. The Glidewell case, supra, contains a very apt and pertinent discussion of this principle (212 Ark. pp. 843–844, 208 S.W.2d p. 8) where the court said:

"The burden rested on appellant, in order to make a jury question, to adduce some substantial testimony from which the jury might have found some act of negligence on the part of appellee, alleged in appellant's complaint.

"This, appellant might establish, either by direct or circumstantial testimony. He could not rely upon inferences, based on conjecture or speculation in order to establish proof of negligence. 'What is meant is that an inference cannot be based upon evidence which is too uncertain or speculative or which raises merely a conjecture or possibility.' 20 Am. Jur., Section 165, page 169."

■ In Continental Cas. Co. v. First National Bank, (5 Cir. 1941) 116 F.2d 885, the court at page 887, 135 A.L.R. 1141 said:

" * * * It should have been left to the jury to determine the ultimate question as to whether any of the assets of the bank had or had not been diminished in reaching the final conclusions as to the liability of

the defendant. This is especially important where the claim is based upon charges of fraud and dishonesty, which are never presumed and which the plaintiff must establish by a fair preponderance of the evidence and not leave to mere speculation and guess. See 22 C.J. Verbo Evidence, p. 948 et seq., §§ 596 and 597 and authorities in footnotes. See, also, Royal Indemnity Company v. North Texas Nat. Bank, Tex.Com.App., 25 S.W.2d 822; Aetna Casualty & Surety Company v. First Trust & Savings Bank, 5 Cir., 62 F.2d 316; Schmieder v. Barney, 113 U.S. 645, 5 S.Ct. 624, 28 L.Ed. 1130. Before the plaintiff can recover any part of its claim, it is necessary to show that a direct loss was actually sustained by the dishonest acts of its employees, since the bond sued on became effective and it should not leave that question in a condition of mere speculation. If it has permitted records to become lost or destroyed, or finds it impossible to make the proof for other reasons, then that is not the fault of the defendant. The bank still carries the burden of establishing its loss, within the terms of the bond, by a fair preponderance of the evidence."

In Salley v. Globe Indemnity Co., 133 S.C. 342, 131 S.E. 616, 43 A.L.R. 971, the allegation in the complaint was:

" 'That, while the said bond was in force and operative, plaintiff lost 50 bales of cotton, of the value of $5,-615.24 from its possession, and for which it was legally liable, and said loss was occasioned by the acts of fraud and dishonesty of the defendant George E. Blackmon, its said manager, and by other acts of the said (George E.) Blackmon against which the plaintiff was protected in and by the aforesaid bond, and the said defendants are justly and truly indebted to plaintiff in the said sum of $5,615.24 for the said cotton, etc.' "

In the above case, the court discussed at length the evidence. The chief question considered by the court was whether it was error to refuse to direct a verdict for the defendant. In the consideration of the question, the court, at page 617 of 131 S.E., at page 973 of 43 A.L.R., said:

"The words in the bond are 'fraud, dishonesty, forgery, theft, embezzlement, wrongful abstraction, or willful misapplication.' It is plain that mere negligence or carelessness will not be sufficient to hold the surety under this bond. This is apparent from even a casual reading of the words. The language used implies positive acts of wrongdoing. The authorities are equally as positive and to the point. 'Thus a loss resulting from the employee's carelessness or inattention to business, or other acts or omissions, not fraudulent or dishonest, imposes no liability on the insurer.' 25 Corpus Juris pp. 1093, 1094; Monongahela Coal Co. v. Fidelity, etc., Co., [5 Cir.] 94 F. 732, 36 C.C.A. 444; State Bank v. Hartford Acc. etc. Co., 28 Pa.Dist.R. 847; [T. M.] Sinclair [& Co.] v. National Surety Co., 107 N.W. 184, 132 Iowa 549; Kansas Flour Mills Co. v. American Surety Co., 158 P. 1118, 98 Kan. 618."

After reviewing the testimony, the court at page 619 of 131 S.E., at page 976 of 43 A.L.R. quoted from a note in 46 L.R.A.,N.S., p. 567, as follows:

" 'As a rule, no recovery can be had upon policies indemnifying against loss by burglary, theft, or larceny, where the evidence merely shows that property covered by the policy is missing.' "

The court further said:

"A careful study of the cases cited in 25 Corpus Juris pp. 1114, 1115, and also the cases cited in note to Citizens' Trust [& G.] Co. v. Globe & Rutgers Fire Insurance Co., [4 Cir.] 229 F. 326, 143 C.C.A. 446, found in Ann.Cas. 1917C, p. 416 et seq., all go to show that the conclu- sions set forth in the above quotations are correct; that is to say, that the simple fact that goods or personal property disappear under circumstances such as are detailed in the testimony in this case will not be sufficient to support the charge of 'fraud and dishonesty' made in the complaint. We hold that the plaintiff has failed to produce testimony tending to prove his case; therefore the motion for a directed verdict ought to have been granted by the court below, and it was error to have refused the motion."

The policy sued upon became effective February 1, 1959, and on that date a prior policy issued by the Indemnity Insurance Company of North America terminated.

The prior policy or the one that terminated on February 1, 1959, provides:

"Sec. 1. Losses covered under this policy only if discovered not later than one year from the end of the policy period. Subject to General Agreement C."

General Agreement C in the prior policy is identical with General Agreement C in the policy sued upon, and the plaintiff undoubtedly could have recovered under the prior policy for any losses that occurred during the time that policy was in force and which were discovered within one year after its termination, if plaintiff were able to prove that the losses occurred "through any fraudulent or dishonest act or acts committed by any of the employees."

The claimed losses in the cigarette inventory were discovered on September 15, 1959. At that time the weekly reports for the weeks ending September 5 and 12, showing the number of cigarettes on hand and which were sold weekly, had not been submitted to Mid-Continent Wholesale, Inc., of Denver, Colorado; therefore, Mrs. Hays, another employee, was asked by Mr. Friedman to complete these reports.

Concerning the losses, Mr. Friedman, in his written statement dated Septem-

ber 21, 1959, to Mr. Bradney, an employee of the adjusting company, inter alia, stated:

"Upon her completing the report for the week ending September 12th, it was disclosed that there was a shortage of 864,000 cigarettes. This report does not show the state cigarette stamp value but the cigarette value amounts to around $9,000.00 alone. I informed Mr. Hardcastle that the report checked 864,000 cigarettes short and he stated that he did not know what happened to the cigarettes and again he told me that the only reason he had changed the weekly cigarette reports was because he was out of balance and wanted to balance it. * * *

"I questioned him about alleged shortage in the Fort Chaffee accounts and he denied taking any money for the payment of this account, stating that according to his knowledge the balance of $6,427.68 was still outstanding.

* * * * * *

"Since all of this had occurred, I am concerned about the accounts receivable, the house annual inventory and also weekly cigarette inventories and the Fort Chaffee account invoices. Arrangements are being made to conduct a complete house and truck inventory at the close of business September 26th and we will not know about the accounts receivable until after statements are mailed from our office on or about October 1st. * * *

"As far as I know as of this time, the only discrepancies are those that I have listed namely, the Army and Air Force Post Exchange account of Fort Chaffee, the alteration of the annual inventory, the weekly cigarette receipts reports and the accounts receivable. I wish to also state that all of our receipts are kept in a combination type safe in our office and the only persons having the combination to this safe were myself and Mr. Hardcastle, the combination on the safe has not been changed but I have taken the keys from Mr. Hardcastle, and have changed the locks on the doors.

* * * * * *

"The last time these trucks were inventoried was on August 1, 1959, during the annual inventory, prior to this time, the last inventory was on or about April 11, 1959. Our cigarette shortage at this time amounts to 864,000 cigarettes but I am unable to state whether this loss occurred over a one week period or whether it has gone on for some time and was covered up by changing the figures on the weekly cigarette reports."

It will be remembered that during the evening of September 15, 1959, Mr. Friedman found receipts for payments in the desk of Mr. Hardcastle amounting to the sum of $2,851.65. In the statement Mr. Friedman listed the name of each customer and the amount which each receipt reflected that the customer had paid, but there is no evidence to indicate whether the accounts were for cigarettes or other items of merchandise that were being sold and distributed by plaintiff.

Without doubt the plaintiff had information which led it to believe that there was a serious shortage in the cigarette inventory, and as Mr. Friedman stated, he intended to begin an investigation to determine whether shortages existed in other inventories, and "we will not know about the accounts receivable until after statements are mailed from our office about October 1st."

The auditors of the plaintiff verbally reported from time to time during their work the status of the various inventories, but made no effort to trace the shortages to Hardcastle or any other employee. Mr. Swofford testified that the shortages could have occurred at any time between August 1958 and September 1959, and that the shortages reported by him depended upon the accuracy of

the starting inventory. For instance, the starting point of the investigation of plaintiff's auditors was the inventory of August 19, 1958.

In reference to the Fort Chaffee account, the auditors found that it had been paid in full prior to April 24, 1958, with the possible exception of $120.00 which occurred in the failure to properly figure the allowable discounts. In considering the entire testimony, there seems to be no doubt that the plaintiff was fully advised prior to February 1, 1960, that shortages in the inventories occurred prior to February 1, 1959, but as above stated, plaintiff gave no notice and took no action against its prior insurer, Indemnity Insurance Company of North America. Therefore, defendant contends that it is not liable for any losses that occurred prior to February 1, 1959, and which were discovered by plaintiff within one year from that date.

The plaintiff makes no contention that the information which it had prior to February 1, 1960, was not sufficient to cause it to believe that some of the shortage occurred while the prior policy was in force.

In 45 C.J.S. Insurance § 804, pp. 857–858, the following statement of the law appears:

"A fidelity bond, in the absence of an express restriction, covers losses occurring within its term, whenever discovered, so long as discovery is in time to permit of suit against insurer within the period of the statute of limitations. However, provisions limiting the period within which discovery of a default must be made as a condition of liability under the bond, such as a provision limiting the liability of insurer to losses discovered during the time of its continuance, or of any renewal thereof, or within a fixed period thereafter, or within a fixed period after the death, dismissal or retirement of the employee, or to losses sustained within a given time prior to discovery, have been held valid and enforceable. Where the liability of insurer is thus limited, there is no liability unless the fraud, dishonesty, or negligence, causing the loss, not only occurred but was discovered within the time limit, notwithstanding the person whose fidelity is guaranteed fraudulently concealed his dishonesty, as where discovery was prevented by a falsification of the employee's books. Also, the insolvency of insured and the appointment of a receiver after the termination of the bond has been held not to suspend such a provision."

In Mitchell Grain & Supply Co. v. Maryland Casualty Co. of Baltimore, 1921, 108 Kan. 379, 195 P. 978, 16 A.L.R. 1488, the court at page 1493 of 16 A.L.R. said:

"* * * The requirement that the loss occasioned to the employer should be discovered before the expiration of six months after the discharge of the employee is sufficiently met by the fact of the existence of the shortage becoming known within that time, although its exact amount may not have been determined until later."

See, Thompson v. American Surety Co. of North America, (8 Cir. 1930) 42 F.2d 953; American Employers' Ins. Co. v. Roundup Coal Mining Co., (8 Cir. 1934) 73 F.2d 592.

The plaintiff contends that because of the delay of the defendant in advising plaintiff that it would contend that it is not liable for losses that occurred while the prior policy was in force and effect, and which were discovered within one year subsequent to the date of the termination of the prior policy, the plaintiff did not notify the prior insurer that a portion of the loss occurred while its policy was in force. Therefore, the plaintiff argues that the defendant is estopped to now contend that it is not liable for any shortages that may have occurred while the prior policy was in force and effect.

The testimony does not disclose that the defendant made any statements to

plaintiff or did anything upon which the plaintiff could reasonably base a belief that the defendant would not claim any and all defenses that were available. On June 19, 1962, after the expiration of the one year allowed under the prior policy for plaintiff to make claim against said policy, the defendant definitely advised plaintiff that it appeared any loss claimed by plaintiff occurred prior to the effective date of the policy sued upon at and at a time when other insurance was in force, and that the plaintiff admits having discovered the alleged losses within time to have made claim under the prior policy.

 The doctrine of estoppel in pais is founded upon the principle of morality and fair dealing, and is intended to subserve the ends of justice. It is necessary that error appear on one side and fault or fraud upon the other, and some miscarriage or defect which would make it inequitable for the party against whom the doctrine is asserted to take advantage. In 19 Am.Jur., Estoppel, Secs. 42–43, pp. 642–43, it is stated:

"Sec. 42. Generally. * * *

"The essential elements of an equitable estoppel as related to the party estopped are: (1) Conduct which amounts to a false representation or concealment of material facts, or, at least, which is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party subsequently attempts to assert; (2) intention, or at least expectation, that such conduct shall be acted upon by the other party; (3) knowledge, actual or constructive, of the real facts. As related to the party claiming the estoppel, they are: (1) Lack of knowledge and of the means of knowledge of the truth as to the facts in question; (2) reliance upon the conduct of the party estopped; and (3) action based thereon of such a character as to change his position prejudicially.

"Sec. 43. Certainty.—Estoppels must be certain to every intent and are not to be taken or sustained by mere argument or doubtful inference. No party ought to be precluded from making out his case according to its truth unless by force of some positive principle of law. Hence, the doctrine of estoppel in pais must be applied strictly and should not be enforced unless substantiated in every particular. The acts, claims, or conduct relied on to estop must be plainly inconsistent with the right afterward set up and must clearly appear to have been done or made by the party whom it is sought to bind. Where, however, the words or acts of a party are clearly shown, he may be concluded not only by the words or acts themselves, but by natural and reasonable inferences therefrom."

In Sun Mutual Ins. Co. v. Dudley, (1898) 65 Ark. 240, at page 250, 45 S.W. 539, at page 542, the court said:

"As to the instruction numbered 9, which was refused, it is sufficient to say that it is not necessary for an insurer to say or do anything in order to claim and be entitled to the benefit or advantage of a forfeiture of its policy until sued thereon, provided the assured, under the circumstances, could not reasonably infer therefrom that the insurer did not intend to insist or rely upon it. Mere silence, without additional or accompanying circumstances, would not be sufficient to warrant such inference. Without this qualification, the instruction should not have been given."

In Capital Fire Ins. Co. v. Shearwood, (1908) 87 Ark. 326, 112 S.W. 878, the court held that where the premium was paid on an insurance policy and afterwards the insured violated the provisions of the policy against encumbrances, which created a forfeiture, of which the insurer had no knowledge of the forfeiture until after the loss occurred, the

insurer did not waive the forfeiture by failing to return the premium before suit was brought and was not precluded by such failure for setting up the forfeiture in defense of the suit. In so deciding, the court, at page 328 of 87 Ark., at page 878 of 112 S.W. said:

"In such cases the insurer has done no affirmative act recognizing the validity of the policy, notwithstanding the forfeiture, and has done nothing to deceive or to increase the burdens of the assured. Therefore the doctrines of waiver and estoppel cannot be invoked against the appellant, under the conceded facts of this record. Queen Ins. Co. v. Young, 86 Ala. 424, 5 South. 116; [Ala.] State Mutual Assurance Co. v. Long Clothing & Shoe Co., 123 Ala. 667, 26 South. 655. See, also, Sun Mut. Ins. Co. v. Dudley, 65 Ark. 240, 45 S.W. 539."

The record does not show when the defendant received information of the terms of the prior policy but, of course, it was familiar with the terms of its own policy. It said nothing about invoking the defense, but it did nothing to lead the plaintiff to believe that all available defenses would not be urged against the claim of the plaintiff. Even though the plaintiff may not have known of or did not consider the provisions of the prior policy, it was not the duty of the defendant to call the plaintiff's attention to the specific provisions of the former policy. Plaintiff was charged with such knowledge.

In Williams v. Davis, (1947) 211 Ark. 725, at page 731, 202 S.W.2d 205, at page 208, the court said:

"This court in the very early case of Jowers v. Phelps, [ad.,] 33 Ark. 465, had this to say on the question of estoppels in pais: 'Estoppels in pais, depend upon facts, which are rarely in any two cases precisely the same. The principle upon which they are applied is clear and well defined. A party who by his acts, declarations, or admissions, or by failure to act or speak under circumstances where he should do so, either designedly, or with willful disregard of the interests of others, induces or misleads another to conduct or dealings which he would not have entered upon but for this misleading influence, will not be allowed, afterwards, to come in and assert his right to the detriment of the person so misled. That would be a fraud. But it is difficult to define special acts or conduct which in all cases would amount to an estoppel. Generally it is said that if the owner of property, with a full knowledge of the facts, stands by, and permits it to be sold to an innocent purchaser, without asserting his claim, he will be estopped. * * * The leading idea is that a person shall not do, or omit to do, anything regarding his rights, which if taken advantage of by him, would work a fraud upon another; but, in this as in all other cases involving fraud, the exact limits and boundaries of fraudulent conduct are left undefined, to be applied by the Chancellor to the facts before him. * * * To stand by and see a sale to an innocent purchaser would be, however, a breach of moral duty, unless the owner meant to abide by it.' "

The defense of estoppel may be invoked in a proper case, but the facts as established by the evidence in this case do not entitle the court to hold that the defendant is estopped from asserting a defense against shortages that occurred during the term of the prior policy and which were discovered by plaintiff within one year after the termination of said policy.

This brings the court to a consideration of whether the plaintiff has established its claim against defendant under the provisions of the policy sued upon and, if so, the amount plaintiff should recover under the facts and the rules of law heretofore discussed and set forth by the court.

The prior policy issued by Indemnity Insurance Co. of North America was in effect from July 1, 1957, until February 1, 1959, when the policy of defendant became effective. The prior policy covered losses caused by the fraud or dishonesty of the plaintiff's employees during the time the policy was in effect or until the close of business on January 31, 1959, if the losses were discovered "not later than one year from the end of the policy period." The plaintiff admits that losses were discovered prior to the expiration of one year from the termination of the prior policy, although the plaintiff did not know on September 15, 1959, the extent of the losses. In the "Proof of Loss" executed by Mr. Friedman on September 21, 1959, he stated:

"Our cigarette shortage at this time amounts to 864,000 cigarettes, but I am unable to state whether this loss occurred over a one week period or whether it has gone on for sometime and was covered up by changing the figures on the weekly cigarette reports."

The other alleged losses were discovered later but within one year from the time of the termination of the prior policy. Had these losses not been discovered in time for plaintiff to have notified the insurer under the prior policy, the defendant would have been liable for such losses if proven in accordance with the requirements of the policy of defendant.

The audits made by Swofford & Co. on behalf of plaintiff and by Douglas Walker & Co. on behalf of defendant used as a starting point the inventory of August 1, 1958, which Mr. Friedman stated he thought was probably correct, but was not certain that the inventory of January 17, 1959, was correct. The figures submitted by the auditing firms practically agree, but the figures arrived at by both auditing firms were based upon an inventory computation, or a profit and loss computation. As heretofore stated, the plaintiff's auditors did not file a formal report, but the auditors of the defendant filed a formal report which discloses that the computed inventory loss for the period beginning August 2, 1958, through January 17, 1959, was as follows:

| | |
|---|---|
| Cigarettes | $1,296.47 |
| Drugs, sundries | 351.31 |
| Appliances | 4,104.89 |
| Miscellaneous | 1,699.39 |
| Total | $7,452.06 |

The computed inventory loss for the period beginning January 18, 1959, through September 26, 1959, showed losses, as follows:

| | |
|---|---|
| Cigarettes | $4,023.82 |
| Drugs, sundries | 708.69 |
| Appliances | 2,705.74 |
| Miscellaneous | 864.75 |
| Total | $8,303.00 |

The report also discloses that salesmen's shortages during the period from January 18, 1959, through September 26, 1959, in the various categories amounted to $688.36.

Under the facts and the law as heretofore stated, the court is of the opinion that the defendant is not liable for the alleged losses in any of the categories for the period from August 2, 1958, through January 17, 1959, and this leaves for consideration whether the defendant is liable for the computed inventory loss in the other categories for the period beginning January 18, 1959, through September 26, 1959.

The evidence is not sufficient to charge the defendant with any losses that are shown by computation of inventory in the categories of drugs, sundries; appliances; and miscellaneous. This leaves for consideration whether the defendant should be charged with the computed inventory loss of cigarettes for that period of time amounting to $4,023.82.

It will be remembered that Mr. Hardcastle testified that he first discovered in October, 1958, that the cigarette inventory showed a loss; that he did not advise Mr. Friedman of his discovery because he thought he would be able to find

the error or the reason why the inventory showed a loss, but he was not able to ascertain the cause of the loss or when it occurred. Apparently Mr. Hardcastle, upon that discovery, began changing the totals in the cigarette inventories and continued to do so until September 17, 1959. The court is unable to determine the loss that occurred between the period beginning January 18, 1959, through January 31, 1959, the date that the defendant's policy became effective, and of which the plaintiff had notice within one year from January 31, 1959, the date of the termination of the prior policy. However, the court is of the opinion that the loss of $4,023.82 in the cigarette inventory is not entirely dependent upon an inventory computation or a profit and loss computation, but that the evidence reasonably proves that such loss was in fact due to the fraud or dishonesty of Mr. Hardcastle.

As to the claimed loss that occurred in the inventories other than cigarettes, the proof does not reasonably prove that the loss was in fact due to the fraud or dishonesty of Mr. Hardcastle.

There is no direct evidence that Mr. Hardcastle embezzled any of the property or money other than $2,851.65, heretofore mentioned, and that sum was repaid to the plaintiff. The court is of the opinion that had Mr. Hardcastle been engaged in actually purloining and removing from any of the inventories the actual property itself, that evidence could have been produced to prove such acts. No effort was made by plaintiff to show that Mr. Hardcastle disposed of any of the physical property included in any of the inventories, but notwithstanding failure to make such proof, the court is convinced that the defendant should be held liable to the plaintiff for the sum of $4,023.82, even though Mr. Friedman admitted that he was not certain that the inventory of January 17, 1959, which was the starting point of the auditors in determining the shortage of that amount was correct.

No evidence was introduced as to the accuracy of the books of account. It is entirely probable that the errors occurred in the bookkeeping, and while Mr. Hardcastle was the supervisor and manager of the business, yet there were other employees who made actual entries from time to time in the books.

In American Employers' Ins. Co. v. Roundup Coal Mining Co., supra, Judge Gardner, at page 595 of 73 F.2d said:

"But, even if it had been proven that the books were incorrect as claimed, this would not have proved that Bunker appropriated or embezzled the difference. It is argued that defendant's bond insured against Bunker's dishonesty, but the mere fact that he may have been dishonest is not a sufficient basis for recovery. Dishonesty in the abstract cannot be compensated in damages, and in a suit to recover on the bond the dishonesty must have resulted in pecuniary loss."

The only proven dishonesty of Hardcastle is his embezzlement of $2,851.65, which is not involved herein, and under the law the court cannot rely upon inferences based on conjecture or speculation in order to establish that the claimed loss "was in fact due to fraud or dishonesty."

In other words, "an inference cannot be based upon evidence which is too uncertain or speculative or which raises a conjecture or possibility."

Therefore the plaintiff is only entitled to recover the sum of $4,023.82, and judgment for said sum in favor of plaintiff and against the defendant, together with costs, is being entered today, and since the plaintiff failed to recover the entire amount claimed and sued for, it is not entitled to recover the statutory attorney's fee and penalty. Southern Farm Bureau Casualty Ins. Co. v. Reed, 231 Ark. 759, 764, 332 S.W.2d 615.